757 F.2d 937
 Sylvester H. SPAETH and Altha K. Spaeth, Appellants,
v.
The UNITED STATES SECRETARY OF the INTERIOR, The United
States of America, Norman Danielson and Wallace
Danielson, Appellees.
 Nos. 84-5039, 84-5054.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 11, 1984.
Decided March 15, 1985.
 
 Nicholas J. Spaeth, Fargo, N.D., for appellants.
 Kathleen P. Dewey, Washington, D.C., and James D. Sinclair, Detroit Lakes, Minn., for appellees.
 Before HEANEY, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 HEANEY, Circuit Judge.
 
 
 1
 Sylvester and Altha Spaeth brought this action against the United States and Norman and Wallace Danielson, seeking a declaratory judgment that the United States's claims of title to certain tracts of the Spaeths' farm, on behalf of unknown heirs of past Indian owners of the land, are without merit. Against the Danielsons, the Spaeths sought damages for raising an allegedly invalid defense of title defects as a bar to complying with a contract for purchase of the Spaeth farm. The district court granted the United States's motion to dismiss for lack of subject matter jurisdiction for the reason that the action is barred by sovereign immunity, and, alternatively, that the Spaeths had not pointed to a final reviewable agency action. The court then granted the Danielsons' motion to dismiss for lack of subject matter jurisdiction for the reason that the dismissal of the federal defendants eliminated pendent jurisdiction over the Danielsons. The Spaeths appeal, arguing that federal agencies have taken several final and reviewable actions which threaten their title to tracts of their farmland, and that review of these actions is not barred by sovereign immunity. They also allege that there is either pendent or independent federal question jurisdiction for their suit against the Danielsons. For the reasons set forth below, we agree with the Spaeths that there is subject matter jurisdiction for both suits, and reverse and remand for a trial on the merits.
 
 
 2
 I. FACTS.
 
 
 3
 In the early 1950's, the Spaeths purchased farmland within Mahnomen County, Minnesota, which is located within the boundaries of the White Earth Indian Reservation. Although the Spaeths purchased the land from non-Indians, portions of the land were at one time owned by Indian allottees, who, under the law which had been followed since at least 1915, legally alienated their allotments by sale or bequest. After farming the land for nearly thirty years, the Spaeths entered into a contract for its sale with appellees Norman and Wallace Danielson.
 
 
 4
 After a title investigation, the Danielsons claimed that, under recent reinterpretations of federal Indian law by the Department of Interior and the Minnesota Supreme Court, the Spaeths did not have clear title to twelve sections[1] of the contract land which had at one time been allotted to Indians under the Nelson Act. The Spaeths then entered into an agreement with the Danielsons under which the sale price of the twelve sections would be reduced by fifty percent if the Spaeths could not provide clear title within seven years. No interest was to be paid on the twelve sections until the Spaeths obtained clear title. This amounted to an $8,000 loss per month. The Spaeths thereafter brought this court action.
 
 
 5
 An understanding of how the clouds on the Spaeths' title developed, whether the Indian claims to their land have merit, and whether there is subject matter jurisdiction for their suit requires a review of the federal government's varying policy over the years with respect to Indian lands on the White Earth Reservation.
 
 
 6
 The White Earth Reservation was created by the treaty of March 19, 1867, 16 Stat. 719, under which the Chippewas of the Mississippi ceded most of their remaining land in Minnesota in exchange for the approximately 800,000-acre White Earth Reservation. The treaty provided that the land within the Reservation was exempt from taxation and sale for debt, and could not be alienated without the approval of the Secretary of Interior, and then only to a Chippewa Indian.
 
 
 7
 In 1887, Congress passed the General Allotment Act, ch. 119, 24 Stat. 388 (1887), codified as amended, 25 U.S.C. Secs. 331-34, 339, 341, 342, 348, 349, 354, 381 (1982), authorizing the division of reservation land among individual Indians. To protect against immediate loss of the lands, the Act provided that each Indian would receive a "trust patent" with the United States holding fee title in trust for twenty-five years for the sole use and benefit of the Indian, or, in case of his or her death, for his or her heirs according to the laws of the state or territory where the land is located. Id., 24 Stat. at 389, Sec. 5. At the expiration of that time, the United States was required to convey the allotment in fee to the Indian or his or her heirs, discharged of the trust and free of encumbrances, provided that the President of the United States might at his discretion extend the period. The allotments were exempt from taxation during the trust period, United States v. Rickert, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903), and conveyances or contracts touching the lands before the expiration of the trust period were declared null and void. 24 Stat. at 389, Sec. 5.
 
 
 8
 The General Allotment Act was effectuated in Minnesota by the Nelson Act of January 14, 1889, ch. 24, 25 Stat. 642 (1889). That Act provided for the appointment of a commission to obtain from the Chippewa Indians in Minnesota a relinquishment of all their remaining lands except for parts of the White Earth and Red Lake Reservations and for allotment of lands in these reservations to individual Indians in conformity with the General Allotment Act.
 
 
 9
 In 1906-07, Congress attempted to rescind the trust provisions of the allotment acts with respect to the White Earth Reservation by enacting what is commonly referred to as the Clapp Amendment. Appropriations Act of June 21, 1906, ch. 3504, 34 Stat. 325, 353, amended by Appropriations Act of Mar. 1, 1907, ch. 2285, 34 Stat. 1015, 1034. The Clapp Amendment, in relevant part, provided that:
 
 
 10
 All restrictions as to the sale, incumbrance, or taxation for allotments within the White Earth Reservation in the State of Minnesota, heretofore or hereafter held by adult mixed-blood Indians, are hereby removed, and the trust deeds heretofore or hereafter executed by the Department for such allotments are hereby declared to pass the title in fee simple[.][2]
 
 
 11
 Id., 34 Stat. at 1034.
 
 
 12
 Subsequently, the courts held the Clapp Amendment invalid to the extent it purported to subject allotment lands to state and local taxes before expiration of the twenty-five year trust period, Morrow v. United States, 243 F. 854 (8th Cir.1917), cf. Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912); United States v. Rickert, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903), but valid to the extent it removed the restrictions on the alienability of the land. United States v. Waller, 243 U.S. 452, 459-62, 37 S.Ct. 430, 432-33, 61 L.Ed. 843 (1917); United States v. First National Bank, 234 U.S. 245, 258, 34 S.Ct. 846, 849, 58 L.Ed. 1298 (1914); Choate v. Trapp, 224 U.S. at 672-73, 32 S.Ct. at 568-69.
 
 
 13
 Prior to the Clapp Amendment of 1906-07, the Department of Interior exercised jurisdiction to determine the heirs of allotment interests. McKay v. Kalyton, 204 U.S. 458, 27 S.Ct. 346, 51 L.Ed. 566 (1907).[3] After the Clapp Amendment, the Department stopped probating the estates of adult mixed-blood Indians on the White Earth Reservation, determining that all such estates should be probated in the courts of the State of Minnesota because of the Clapp Amendment.[4] A 1915 opinion by the Solicitor for the Department of Interior confirmed this practice by ruling that the Department no longer had probate or other jurisdiction over adult mixed-blood Indian allottees on the White Earth Reservation. Solicitor's Opinion No. D-29636, Department of the Interior, Office of the Solicitor (Aug. 2, 1915). Thereafter, the courts of the State of Minnesota undertook responsibility for probating the estates of adult mixed-blood Indian allottees on the White Earth Reservation, and this practice was upheld by the Minnesota Supreme Court, Baker v. McCarthy, 145 Minn. 167, 176 N.W. 643 (1920), and the federal district court for the District of Minnesota. Bisek v. Bellanger, 5 F.2d 994 (D.Minn.1925).
 
 
 14
 An additional consequence of the Clapp Amendment and the Solicitor's 1915 Opinion was that subsequent land transactions on the White Earth Reservation between adult mixed-blood Indian allottees and other individuals proceeded in accordance with Minnesota law rather than federal law.[5] For over sixty years, this practice continued with the approval of the federal government. As a result, it was determined that mixed-blood females over eighteen, but under the federal age of adulthood of twenty-one, were legally competent to sell their White Earth allotments because the law of the State of Minnesota set their age of adulthood at eighteen.[6] Additionally, the State of Minnesota began to levy taxes on some allotments held by adult mixed-blood Indians on the White Earth Reservation. After the Indians failed to pay these taxes, the allotments were sold in tax forfeiture proceedings to other individuals, and some allotments were taken over directly by the State of Minnesota. Subsequently, the Spaeths purchased lands from non-Indians within the boundaries of the White Earth Reservation, and acquired good title under the law and federal policy as it existed at that time.
 
 
 15
 This law and policy changed beginning in 1977 with the Minnesota Supreme Court's decision in State v. Zay Zah, 259 N.W.2d 580 (Minn.1977), cert. denied, 436 U.S. 917, 98 S.Ct. 2263, 56 L.Ed.2d 758 (1978). In that case, Eugene and Laurie Stevens brought an action to quiet their title to real estate which they had purchased from the Commissioner of Taxation for the State of Minnesota. The real estate had been allotted to Zay Zah in 1927 and, in 1961, forfeited for failure to pay real estate taxes for the year 1954. The Stevenses purchased the tax-forfeited allotment in 1973. The parties agreed that, notwithstanding the Clapp Amendment, Zay Zah's allotment was not taxable during the initial twenty-five-year trust period which ended in 1952. The issue before the court was whether Zay Zah's allotment was subject to taxation following the expiration of the original twenty-five-year trust patent, or whether its tax immunity was extended indefinitely because of the indefinite extension of the original twenty-five-year trust period by section 2 of the Indian Reorganization Act of 1934, ch. 576, Sec. 2, 48 Stat. 984 (1934), (codified at 25 U.S.C. Sec. 462 (1982)).
 
 
 16
 The Stevenses argued that, although the Clapp Amendment could not divest the allotment's tax immunity during the original twenty-five-year trust period, it did eliminate the "trust" aspect of the patent and, thus in their view, authorized taxation on the allotment after the twenty-five-year trust period ended. Zay Zah's heir and the United States as amicus argued "that the 'trust status' of the allotment was in itself a constitutionally protected vested property right, thereby preventing taxation not only during the twenty-five-year period, but also thereafter by reason of the indefinite extension of the 'trust status' by the Wheeler-Howard Act of 1934." Zay Zah, 259 N.W.2d at 583.
 
 
 17
 The court adopted the argument of Zay Zah's heir and the United States and held that Zay Zah's heir retained equitable title to the allotment with the United States holding fee title in trust. Despite the broad implications of this holding, however, the court emphasized that its holding was limited to the facts before it. Zay Zah's heir still held equitable title to the allotment because it was improperly forfeited from Zay Zah for failure to pay real estate taxes which were not owed because Zay Zah had not clearly consented to termination of the trust period, and the United States still held fee title in trust. The Spaeths, at oral argument, indicated--and the appellees did not disagree--that none of their land was ever tax forfeited and, thus, Zay Zah is not directly applicable. Instead, the Spaeths' title problem stems directly from the United States's subsequent extension of the Zay Zah holding.
 
 
 18
 Following the decision in Zay Zah, the Solicitor of the Department of Interior issued an opinion reversing its 1915 opinion No. D-29636 on the proper probate jurisdiction for White Earth Reservation allottees. Memorandum from the Office of the Solicitor, Department of the Interior to the Assistant Secretary, Indian Affairs (May 9, 1979). See also Memorandum from Field Solicitor, Twin Cities, Minnesota, to Associate Solicitor, Indian Affairs, Washington, D.C. (Oct. 6, 1978). Relying on the reasoning and dicta from Zay Zah, the opinion concluded that the 1915 opinion, and the state and federal cases which had relied upon it, were erroneous because the Department retained responsibility to probate the estates of mixed-blood Indians on the White Earth Reservation notwithstanding the Clapp Amendment. The Solicitor also determined that its new interpretation should apply retroactively, and it advised the Department to direct the Bureau of Indian Affairs (BIA) to prepare for submission to the Office of Hearings and Appeals the necessary materials for the federal reprobate of the estates of mixed-blood allottees from the White Earth Reservation which since at least 1907 had been probated in the courts of the State of Minnesota.
 
 
 19
 The Spaeths allege that in late 1979, they and many other similarly situated landowners in Mahnomen County received a letter from the BIA threatening litigation to clear the United States's title to any lands where, in the chain of title, a tax forfeiture from a mixed-blood Indian allottee had occurred, the estate of a mixed-blood Indian transferror had been probated in state court, or the land had been sold by a female mixed-blood Indian aged eighteen to twenty.[7] Subsequently, according to the Spaeths, the United States refused to issue mortgage loans through either the Farmers Home Administration or the Federal Land Bank where any of these three title defects existed. The Spaeths allege that these agencies had thus extended the Solicitor's 1979 opinion one additional step by concluding that a necessary implication of that opinion was that federal law, not state law, governed the propriety of allotment transfers between mixed-blood Indians and other individuals and, thus, that all transfers of allotments by mixed-blood females under the federal age of adulthood of twenty-one were invalid. The result of these significant reinterpretations of federal law was that land transfers in Mahnomen County were blocked, individuals holding such land could no longer obtain mortgage loans on it, the valuation of the land fell, and, generally, millions of dollars of economic dislocation occurred.
 
 
 20
 The gist of the Spaeths' suit is that the Solicitor's 1979 opinion is erroneous as a matter of law,[8] or that, even if it is correct, it does not affect their title to the land they have owned for over thirty years.
 
 
 21
 II. DISCUSSION.
 
 
 22
 A. Subject Matter Jurisdiction to Sue the United States.
 
 
 23
 It is well established that the United States may not be sued without its consent. United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). The Spaeths contend that the necessary consent for their suit against the United States is provided by section 702 of the Administrative Procedure Act (A.P.A.), 5 U.S.C. Sec. 702 (1982). However, as the district court held, A.P.A. Sec. 702 provides that, "[n]othing herein confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. Sec. 702 (1982). The district court held that 28 U.S.C. Sec. 2409a (1982) is such a statute. 28 U.S.C. Sec. 2409a, in relevant part, provides that "[t]he United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest * * *. This section does not apply to trust or restricted Indian lands[.]" Because the United States claimed that sections of the Spaeths' farm are "trust or restricted Indian lands," the court held that the Spaeths' suit against the United States is barred.
 
 
 24
 The Spaeths contend that contrary to the district court's holding, section 2409a is inapplicable because their suit does not seek "to adjudicate a disputed title to real estate" but merely seeks a declaratory judgment that the alleged title defects are illusory. We reject this distinction; section 2409a is directly applicable because the Spaeths' suit is essentially a suit to adjudicate a disputed title to real property in which the United States claims an interest. The dispositive issue here is thus whether section 2409a's general waiver of sovereign immunity applies or whether instead section 2409a's exception to that waiver for "trust or restricted Indian lands" is applicable. We reject the district court's holding that section 2409a does not provide the requisite federal consent for the Spaeths' suit because the United States made an unsubstantiated claim that the lands at issue are "trust or restricted Indian lands." Instead, we find that section 2409a does provide the requisite consent for the Spaeths suit unless the United States can prove that there is a "substantial" possibility that the lands in question are "trust or restricted Indian lands." Newman v. United States, 504 F.Supp. 1176, 1179 (D.Ariz.1981). Because the district court did not address this issue, we reverse and remand for a resolution of this issue on the merits. On the record before us, and without the benefit of findings or briefing on these issues, we can only determine that there may or may not be a substantial possibility that the Spaeths' lands are trust or restricted Indian lands.
 
 
 25
 Although we express no view on the merits of the Indian claims, we believe there are a number of close questions which must be resolved after a full briefing from the parties before it can be determined whether the Indian claims to the Spaeth land are substantial, and thus whether the Spaeths' suit against the United States is barred by 28 U.S.C. Sec. 2409a (1982).
 
 
 26
 First, there is the question whether there is a substantial possibility that certain sections of the Spaeth farm are "trust or restricted Indian lands" because at some point in the chain of title, an estate of a mixed-blood Indian owner of the land had been probated in state court and not by the Secretary of the Interior. The second title problem concerns whether there is a substantial possibility that certain sections of the Spaeth farm are "trust or restricted Indian lands" because at some point in the chain of title, the land had been transferred by a female mixed-blood Indian eighteen to twenty years old.
 
 
 27
 We address the probate jurisdiction problem first. To determine whether there is a substantial possibility that the Spaeths do not hold title to certain sections of their farm because at some point in the chain of title a state court probated the estate of an adult mixed-blood Indian allottee, the court on remand must address the following issues. First, the district court must determine if the Solicitor's 1979 opinion has a substantial basis in law. Under the government's view, the Solicitor's 1979 Opinion is merely a necessary result of Zay Zah, which is no longer reviewable. Because that case, under the government's view, determined that the "trust status" of an allotment is itself a constitutionally protected vested property right, all the aspects of "trust status" are vested property rights, including a federal probate upon the death of the allottee and the application of the federal age of adulthood for females instead of the state age of adulthood for females. However, although Zay Zah rests upon the theory that the "binding trust agreement" between the United States government and the allottee is a constitutionally protected property right which "continues in full effect * * * until its term expires or the patentee accepts title in fee simple," Zay Zah, 259 N.W.2d at 586, that court's holding only concerned an allotment which was improperly tax forfeited. Extension of the court's reasoning to the question of probate jurisdiction over allotments may be erroneous in light of the longstanding distinction drawn by this Court and the United States Supreme Court that the Clapp Amendment was unconstitutional to the extent it attempted to end the tax exempt status of allotments so long as the trust status continued, Morrow v. United States, 243 F. 854 (8th Cir.1917), and see Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912), but constitutional to the extent it removed the restrictions on alienability of the allotment. United States v. Waller, 243 U.S. 452, 461-63, 37 S.Ct. 430, 432-33, 61 L.Ed. 843 (1917); United States v. First National Bank, 234 U.S. 245, 258, 34 S.Ct. 846, 849, 58 L.Ed. 1298 (1914); Choate, 224 U.S. at 672-73, 32 S.Ct. at 568-69 ("The tax exemption and the nonalienability were two separate and distinct subjects. One conferred a right and the other imposed a limitation."). An implication of these decisions was that the Clapp Amendment validly ended the United States's responsibility to probate White Earth allotments held by adult mixed-blood Indians.[9] In light of the acceptance of this conclusion by the Solicitor in 1915, the Assistant Attorney General of the United States in 1917, see Opinion of F.J. Kearful, Assistant Attorney General to the Secretary of Interior, December 24, 1917, the Minnesota Supreme Court in 1920, Baker v. McCarthy, 145 Minn. 167, 176 N.W. 643 (1920), and the federal district court for the District of Minnesota in 1925, Bisek v. Bellanger, 5 F.2d 994 (D.Minn.1925), it may be that the Solicitor's rejection of these holdings in 1979 is erroneous and that Zay Zah must be limited to cases involving tax forfeiture of allotments. If the court determines that there is not a substantial basis for the claim that, notwithstanding the Clapp Amendment, the courts of the State of Minnesota did not have probate jurisdiction over White Earth allotments held by adult mixed-bloods who had not applied for a fee simple title, then the Spaeths are entitled to a declaratory judgment to this effect.
 
 
 28
 If the court, however, determines that there is a substantial basis in law for the Solicitor's claim of exclusive federal probate jurisdiction, then it must determine if the Solicitor's 1979 opinion to this effect should be applied retroactively in light of the adverse effects on innocent third parties and the significant risk of error in reprobating estates which were already probated in state court as long as seven decades ago. If the court on remand determines that there is no substantial reason for retroactively applying the Solicitor's 1979 opinion, then the Spaeths' title will be unaffected and they are entitled to a declaratory judgment to this effect.
 
 
 29
 If, however, the court determines that the Solicitor's 1979 opinion has a substantial basis in law, and that there is a substantial basis for applying the decision retroactively, then it must address whether, as a factual matter, there is a substantial possibility that the Spaeths' title will be affected. Although we find no direct holding on this issue, it appears that the Office of Hearings and Appeals will apply the laws of the State of Minnesota in probating White Earth allotment estates. See section 5 of the General Allotment Act, 24 Stat. 388, 389 (1887); McKay v. Kalyton, 204 U.S. at 465-66, 27 S.Ct. at 348-49; United States v. Parkland Co., 188 F. 383 (D.Minn.1911). If the same law will be applied for reprobating these estates, the chance that the heirs will be different may not be substantial. The Spaeths, at oral argument, indicated that several reprobates had been completed by the time of oral argument and that, in each case, the beneficial heirs of the allotment have been determined to be the same. The court on remand should inquire into the reprobating procedures and determine if there is a substantial possibility that the reprobating of allotments now held by the Spaeths will adversely affect their title. Additionally, the Solicitor's 1979 opinion only requires the reprobate of estates of mixed-blood allottees on the White Earth Reservation where the allottee did not apply for fee simple title to the allotment. Thus, even if some of the Spaeths' land was once held by a mixed-blood Indian and probated in state court, their title is unaffected if the allottee applied for a fee simple title. To the extent possible, the court on remand should address this factual prerequisite to application of the Solicitor's 1979 opinion. If the court determines that there is not a substantial possibility that the Spaeths' title will be affected, then they are entitled to a declaratory judgment to this effect.[10]
 
 
 30
 If the court determines (1) that the Solicitor's 1979 opinion has a substantial basis in law; (2) that there is a substantial basis for retroactively applying the decision; and (3) that, as a factual matter, there is a substantial possibility that the Spaeths' title will be affected by the reprobating, then further inquiry into the ultimate merits of these issues is barred by the "trust or restricted Indian lands" exception of 28 U.S.C. Sec. 2409a (1982). Because several sections of the Spaeth farm are affected by the probate jurisdiction problem, it may be that there is a substantial possibility that some of the sections are "trust or restricted Indian lands" but no substantial possibility that other sections are "trust or restricted Indian lands." With respect to any section of land to which the Indian claims are substantial, suit is barred by section 2409a. With respect to any section of land to which the Indian claims are not substantial, the Spaeths are entitled to a declaratory judgment to this effect.
 
 
 31
 Next we address the age of adulthood problem. With respect to this problem, the court on remand must engage in an analysis similar to that outlined above to determine whether there is a substantial possibility that, notwithstanding the Clapp Amendment, the federal age of adulthood for females of twenty-one should have been applied since 1907 instead of Minnesota's age of adulthood for females of eighteen. The court must address whether there is a substantial legal basis for the claim that the federal age of adulthood should be applied, whether there is a substantial basis for retroactively applying federal law instead of the state law which has been applied since 1907, and whether, as a factual matter, there is a substantial possibility that the Spaeths' title will be affected. We express no view on the merits of this issue, although we note that it may be entirely distinct from the tax immunity and probate jurisdiction questions.
 
 
 32
 If the court determines that there is no substantial possibility that the Spaeths' title will be affected by the age of adulthood problem, then the Spaeths are entitled to a declaratory judgment to this effect. With respect to any section of land to which the Indian claims of title are substantial, further inquiry into the ultimate issue of who holds title to the lands is barred by the Indian-land exception of 28 U.S.C. Sec. 2409a (1982).
 
 
 33
 To assure a full and fair resolution of the issues set forth above, the court on remand must allow the intervention of any interested potential Indian beneficiaries of the Spaeths' land, as well as any Indian rights groups who wish to join as parties or intervenors. Additionally, of course, the United States, as trustee for the unknown Indian beneficiaries, if any, must actively represent their interests. It may be that the United States or any potential Indian beneficiaries may wish to assert not only that their claims to ownership of certain section of the Spaeth farm are substantial, but that they are the actual title holders to these lands. If so, the court may proceed to determine the ultimate merits of these claims. See 25 U.S.C. Sec. 345 (1982); 28 U.S.C. Sec. 1353 (1982); Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968); Cohen, Federal Indian Law, ch. 6, sec. A3a (1982).
 
 
 34
 In conclusion, we note that our analysis of the jurisdictional issues is affected by the extremely unusual facts of this case. For over a hundred years, the federal government has substantially changed its policy with respect to Indian lands within the White Earth Reservation. From 1906 to 1915, it adopted the policy that the allotments held by adult mixed-blood Indians were no longer held in trust, and were subject to the laws of the state. It argued for and received approval of this policy in state and federal court, and then followed this policy for over seventy years. The Spaeths relied on this policy, but in the late 1970's were told that the law and federal policy had changed and they no longer owned large sections of the land they had farmed, improved, and paid taxes on for over thirty years.
 
 
 35
 It may be that the government's new interpretation of federal Indian law is correct; if so, however, the government should be working with reasonable speed to lessen the impact of its policy changes on innocent third parties like the Spaeths.[11] In 1983, the Minnesota legislature passed an act which would have provided substantial assistance to any federal effort to solve the problem in the event federal legislation was enacted.[12] In 1984, however, despite the pressing need for legislation as a result of the federal government's policy reversal, two congressional bills to resolve the White Earth title problems failed.[13]
 
 
 36
 Six years have now passed since the Solicitor's 1978 opinion; in light of the resulting adverse impact on innocent landowners like the Spaeths, we believe it is reasonable to require the government at least to litigate whether there is a substantial possibility that its reversal of longstanding federal law and policy has affected the Spaeths' title to their farm.
 
 
 37
 B. Federal Jurisdiction to Sue the Danielsons.
 
 
 38
 Next, we address whether there is federal jurisdiction for the Spaeths' action against the Danielsons. If the court below determines that there is no substantial basis for the government's claim that the Spaeths' lands are "trust or restricted Indian lands," and thus that there is subject matter jurisdiction for the Spaeths' suit against the United States, then there is pendent jurisdiction for the claims against the Danielsons.[14]
 
 
 39
 If, however, the court determines that there is no subject matter jurisdiction for the Spaeths' suit against the federal government, then the suit against the Danielsons must also be dismissed. Under the well-pleaded complaint rule, Gully v. First National Bank, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936); Louisville & Nashville R.R. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911), the federal question must appear in the plaintiff's complaint in order to make the case arise under federal law and provide jurisdiction based on 28 U.S.C. Sec. 1331. Plaintiffs' complaint does not establish a cause of action arising out of the constitution and laws of the United States because their cause of action, like the cause of action in Gully, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70, is an action for breach of contract and is created by state law. The federal question only arises from the Danielsons' potential defense of unmarketable title based on federal law. Additionally, as the Danielsons point out, if the court below determines that the suit against the United States must be dismissed because the Indian claims to the land are substantial, then the Spaeths will be unable, through litigation against the Danielsons, to satisfy their contractual obligation to deliver marketable title. Moreover, litigation of Indian title questions without the participation of the United States as trustee for the Indians, or the Indian claim holders themselves, is improper. In sum, if there is no subject matter jurisdiction for the Spaeths' suit against the United States, then there is no jurisdiction over their suit against the Danielsons either.
 
 
 40
 Reversed and remanded for further proceedings consistent with this opinion.
 
 
 41
 HENLEY, Senior Circuit Judge, concurring in the remand.
 
 
 42
 While I agree with much of the majority opinion, and agree that a remand is in order, I fear the Court may have unnecessarily complicated the standard by which the jurisdictional question on remand is to be governed. I therefore write separately to express my concern on this issue.
 
 
 43
 As stated by the majority, if the Spaeths' land is "trust or restricted Indian land," their suit is barred by section 2409a and we lack subject matter jurisdiction. See United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) (defense of sovereign immunity is jurisdictional).[1] I agree that because the present record is inadequate to resolve several key legal and factual issues, a remand is required for the district court to make findings of fact and conclusions of law on these issues. However, I cannot subscribe to the use of a "substantial possibility" standard. To me, this is simply a situation where the threshold jurisdictional issue is intertwined with the merits and must be decided. Either we have jurisdiction or we do not! If in deciding jurisdiction we also decide the merits, so be it.
 
 
 44
 It is established that a court has jurisdiction to determine whether it has jurisdiction. Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d Sec. 3536 (1984). As a corollary to this rule, "if the attack on jurisdiction requires the court to consider the merits of the case, the court has jurisdiction to proceed to a decision on the merits." Thornhill Publishing Co. v. General Telephone & Electronics, 594 F.2d 730, 734 (9th Cir.1979); see Land v. Dollar, 330 U.S. 731, 739, 67 S.Ct. 1009, 1013, 91 L.Ed. 1209 (1947); Eastern Kentucky Welfare Rights Org. v. Simon, 506 F.2d 1278, 1283 (D.C.Cir.1974), vacated on other grounds, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).
 
 
 45
 The only logical way to ascertain whether the Spaeths' land is correctly categorized as "trust or restricted Indian land" within the meaning of section 2409a, and hence whether there is federal subject matter jurisdiction, is to determine whether the solicitor's 1979 Opinion was correct in extending Zay Zah beyond the tax forfeiture situation. For it is only if it was so correctly extended that the Spaeths' property could properly be considered restricted by federal law within the meaning of section 2409a. If Zay Zah was not correctly extended by the Solicitor, the Spaeths' land could not rationally be considered "trust or restricted Indian land."
 
 
 46
 I would therefore remand the case for the district court to make findings and conclusions after the following issues have been fully briefed by the parties: (1) whether the Solicitor was correct in extending Zay Zah to estates of mixed-blood Indians which had been probated in state court and not by the Secretary of the Interior and in extending Zay Zah to land transfers by female mixed-blood Indians aged eighteen to twenty years old; (2) if the Solicitor correctly extended Zay Zah to these situations, it should determine whether the Solicitor's 1979 Opinion should be applied retroactively; and (3) if the Solicitor's 1979 Opinion is correct and should be applied retroactively, the district court should make a factual determination as to whether reprobating the land under federal law will actually adversely affect the Spaeths' title, and, if so, how much of their land will be so affected. These are essentially the questions outlined by the majority opinion but without the inclusion of the "substantial possibility" standard.
 
 
 47
 Only by resolving the above issues can the court determine if the Spaeths' land is, as a matter of law and fact, "trust or restricted Indian land." United States v. Phillips, 362 F.Supp. 462 (D.Neb.1973). If it is, then dismissal of the Spaeths' suit would be for lack of jurisdiction. If it is not, judgment could be entered for the Spaeths on the merits. Because these issues must be addressed regardless of whether one denominates them jurisdictional or whether one considers them to be decisions on the merits, I would not inject additional considerations into the already difficult analysis. In short, I would decide the question whether we have jurisdiction, not the question whether there is a "substantial possibility" that we have jurisdiction.[2] However, because I agree that a remand is necessary for the district court to address the issues which have been outlined after they have been fully briefed by the parties, I concur in the remand.
 
 
 
 [1]
 The Spaeths, at oral argument, indicated that twelve sections of their farm are at issue; for purposes of this opinion, we assume this is true
 
 
 [2]
 The Clapp Amendment also provided for removal of all trust restrictions on allotments held by full-blood Indians on the White Earth Reservation upon the Secretary of Interior's certification of their competency. This provision is not at issue in this case
 
 
 [3]
 In McKay, the Court held that although the General Allotment Act provides for application of the heirship laws of the state or territory where the allotment is located, state courts have no probate jurisdiction under the Act. Instead, jurisdiction over allotment inheritance cases rests with the Secretary of the Interior, or, after the Act of August 15, 1894, ch. 290, 28 Stat. 286 (1894) (codified as amended at 25 U.S.C. Secs. 345-46 (1982)), with the Secretary of Interior and the federal district courts. McKay, 204 U.S. at 467-70, 27 S.Ct. at 349-50
 
 
 [4]
 Prior to 1910, the Department's jurisdiction over allotment inheritance cases was premised on the United States's trust responsibility under the General Allotment Act, McKay, 204 U.S. at 467-70, 27 S.Ct. at 349-50. Because the Clapp Amendment declared an end to the trust period over allotments held by adult mixed-blood Indians on the White Earth Reservation, the Department determined that it no longer had probate or other jurisdiction over these allotments. Although an act of June 25, 1910, ch. 431, Secs. 1-2, 36 Stat. 855 (1910), (codified as amended at 25 U.S.C. Secs. 372-73 (1982)), provided that the Secretary shall exercise jurisdiction over trust allotment probate matters, Congress did not intend that this Act apply to White Earth Reservation allotments held by adult mixed-blood Indians because it had recently passed the Clapp Amendment which provided that these allotments were no longer covered by the trust provisions of the Nelson or General Allotment Acts. Solicitor's Opinion No. D-29636, Department of the Interior, Office of the Solicitor (Aug. 2, 1915)
 
 
 [5]
 The Act of May 8, 1906, ch. 2348, 34 Stat. 182 (1906) (codified as amended at 25 U.S.C. Sec. 349 (1982)), provides that all Indian allottees, with patent in fee to their lands, shall be subject in all respects to the laws of the state wherein they reside
 
 
 [6]
 See Waller, 243 U.S. at 463-64, 37 S.Ct. at 433 (quoting Dickson v. Luck Land Co., 242 U.S. 371, 375, 37 S.Ct. 167, 169, 61 L.Ed. 371 (1917)) (After issuance of fee patent to allotment, the allottee becomes subject to the laws of the state, including "those governing the transfer of real property, fixing the age of majority and declaring the disability of minors.")
 
 
 [7]
 The Spaeths allege that they received the letter cited above but did not retain it. The record contains several of the letters received by other Mahnomen County landowners. These letters differ substantially; some described possible defects in title to lands in Mahnomen County as a result of the Zay Zah decision, others allege that specific lands allegedly owned by the letter recipient are in fact owned by the United States as trustee for unknown Indians, and that the United States intends to bring litigation to clear its title to the land. The letters in the record only concern title defects due to tax forfeitures held invalid in Zay Zah. The Spaeths allege that the letter which they received also alleged title defects as a result of an improper probate, or a sale by a mixed-blood female Indian under the age of twenty-one. Brief of Appellants at p. 15; see also paragraph 13 of Complaint. Their brief also quotes a letter from the Danielsons alleging that landowners in Mahnomen County had received letters alleging title defects due to sale of the land at one time by a female mixed-blood Indian under the age of twenty-one. For purposes of review of the grant of the Fed.R.Civ.P. 12(b)(6) motion, we assume that the Spaeths' allegations are true. In any event, other federal agency actions indicate that the United States has alleged defects in title to lands in Mahnomen County because of an allegedly improper probate of an allotment interest, or an allegedly illegal sale by an underage female mixed-blood Indian
 
 
 [8]
 As we have noted, this appeal does not involve allotment lands which were improperly tax forfeited. We address only those title clouds which affect the Spaeths' property. These claims concern the proper probate jurisdiction for a White Earth Reservation allotment, and the legal age of adulthood for a female mixed-blood Indian allottee on the White Earth Reservation after the Clapp Amendment was passed in 1906-07
 
 
 [9]
 Determining whether this is true requires two distinct inquiries. Prior to 1910, the United States's responsibility to probate allotments was viewed as an aspect of its trust responsibility over allotments. McKay v. Kalyton, 204 U.S. at 467-70, 27 S.Ct. at 349-50. After 1910, this responsibility was also imposed by the Act of June 25, 1910, ch. 431, 36 Stat. 855 (codified as amended at 25 U.S.C. Secs. 372-73) (1982). Whether the Clapp Amendment could end the United States's probate responsibility recognized in McKay may be an entirely distinct question from whether Congress could determine that the Act of June 25, 1910, ch. 431, 36 Stat. 855, was inapplicable to White Earth allotments held by mixed-blood Indians
 
 
 [10]
 We express no view on whether a declaratory judgment in favor of the Spaeths will satisfy their contractual obligation to deliver "marketable title." If necessary, the court on remand will have to address the Danielsons' arguments on this point
 
 
 [11]
 We are not unaware that the federal government's varying policies with respect to White Earth Reservation land has also had extreme detrimental impact upon the Chippewas of the White Earth. See Peterson, That So-Called Warranty Deed: Clouded Land Titles on the White Earth Indian Reservation in Minnesota, 59 N.D.L.Rev. 159 (1983)
 
 
 [12]
 1984 Minn.Sess.Law Serv., ch. 539 (West). The Act provides that if the United States Congress passes "appropriate legislation as described in section 1 by December 31, 1985," id. Sec. 4, the State of Minnesota will transfer "from the state to the United States the ownership of 10,000 acres of land within the White Earth Reservation currently owned in fee or in trust for local taxing districts by the State of Minnesota, including mineral interests[.]" Id. Sec. 2. The Act also appropriates $600,000 to be used "to provide technical and computer assistance to the United States for implementing the settlement described in section 1," and "for necessary publication, administrative, and consulting costs in negotiating or implementing the agreement or settlement." Id. Sec. 3
 
 
 [13]
 S. 885, 98th Cong., 1st Sess. (1984); H.R. 2246, 98th Cong., 1st Sess. (1984). At oral argument, the parties indicated that both bills failed to make it out of committee
 
 
 [14]
 As noted previously, due to potential factual differences between the Indian claims to the Spaeths' land, some of the claims may be substantial and others not. Accordingly, there is pendent jurisdiction over the Danielsons only with respect to those sections of land, if any, to which the Indian claims are not substantial. Thus, for example, of the twelve sections of land in question, the court below might determine that there is a substantial possibility that six of the sections are trust or restricted Indian lands, but no substantial possibility that the remaining six sections are trust or restricted Indian lands. Thus, the Spaeths would be able to litigate their contractual disputes with the Danielsons in federal court only with respect to the six sections of land to which the Indian claims are not substantial
 
 
 [1]
 While 28 U.S.C. Sec. 1346(f) confers jurisdiction on federal district courts for actions under section 2409a, Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction Sec. 3656 (1976), section 2409a itself may deprive the court of jurisdiction
 
 
 [2]
 Lest it be said that the merits should not be decided "behind the back" of the government, see Louisiana v. Garfield, 211 U.S. 70, 78, 29 S.Ct. 31, 33, 53 L.Ed. 92 (1908), it may be noted that the United States and its representatives are in the lawsuit now. They are entitled to a decision and doubtless will fully participate in the proceedings on remand