837 F.2d 340
 Marie DUCHENEAUX, Appellee,
v.
SECRETARY OF THE INTERIOR OF the UNITED STATES, Appellant,
June Ellen Ducheneaux Ledbetter; Lillian Lynn Ducheneaux;
Ria Elaine Ducheneaux Seaboy; Orville Rolland Ducheneaux;
Larry Douglas Ducheneaux; Deanna Ducheneaux Mulloy; Allen
Theodore Ducheneaux; Marlene Kay Ducheneaux;
Superintendent of Cheyenne River Agency and United States
Bureau of Indian Affairs, Appellants.
Marie DUCHENEAUX, Appellee,
v.
SECRETARY OF THE INTERIOR OF the UNITED STATES; June Ellen
Ducheneaux Ledbetter; Lillian Lynn Ducheneaux; Ria Elaine
Ducheneaux Seaboy; Orville Rolland Ducheneaux; Larry
Douglas Ducheneaux; Deanna Ducheneaux Mulloy; Allen
Theodore Ducheneaux; Marlene Kay Ducheneaux, Appellants.
Superintendent of Cheyenne River Agency and United States
Bureau of Indian Affairs.
 Nos. 87-5023, 87-5024.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 4, 1987.
Decided Jan. 26, 1988.
 
 Maria A. Iizuka, Washington, D.C., and Krista Clark, Mission, S.D., for appellant.
 Newell E. Krause, Mobridge, S.D., for appellee.
 Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MAGILL, Circuit Judge.
 MAGILL, Circuit Judge.
 
 
 1
 In this case we examine the district court's ruling that the theory of spousal contribution applied to divest an Indian's heirs of the land held in trust for him by the United States. We conclude that the district court lacked jurisdiction to order apportionment of the trust property and erroneously overrode a valid will. Accordingly, we reverse.
 
 
 2
 I. BACKGROUND.
 
 
 3
 The facts and procedural history are thoroughly set out in the district court's opinion, Ducheneaux v. Secretary of the Interior, 645 F.Supp. 930 (D.S.D.1986), and will only be summarized here.
 
 
 4
 Douglas Ducheneaux, a member of the Cheyenne River Sioux Tribe, married Marie Snoble, a non-Indian, in 1948. During the marriage, the couple bought five quarter sections of land on the Cheyenne River Indian Reservation in South Dakota. The land was placed in Douglas' name and held in trust for him by the United States.[1]
 
 
 5
 The couple separated in 1971, after twenty-two years of marriage. Douglas began but never completed divorce proceedings. Marie then tried unsuccessfully to get partition of the land, but it remained in trust for Douglas.
 
 
 6
 Douglas died nine years after their separation. In his will he left his whole estate to his nieces and nephews, all enrolled members of the Cheyenne River Sioux Tribe. He expressly disinherited Marie.
 
 
 7
 Marie filed objections to the will and sought half of the land acquired during the marriage, alleging that she had contributed in equal part to its acquisition, financially and through her labors as a wife. She claimed that the land should be characterized as being held in a resulting or constructive trust for her benefit. An Administrative Law Judge (ALJ) for the Department of the Interior denied her claim to the land, holding that in view of the unique status and purpose of Indian trust land, the United States owed no trust responsibility to Marie because she is a non-Indian. The denial of relief was affirmed on appeal to the Interior Board of Indian Appeals, and thus became the final decision of the Secretary of the Interior. Marie then appealed to the district court.
 
 
 8
 The district court reversed, holding that the theory of spousal contribution was applicable because Marie had contributed as much to the acquisition of the property as had her husband. The district court concluded that because she owned an interest in the property, it was hers no matter how Douglas purported to dispose of it in his will. The district court ordered that Marie receive an undivided one-half interest in the property as well as one-half of the rents and profits from the entire five quarter sections of land as of the date of Douglas' death.
 
 
 9
 II. DISCUSSION.
 
 
 10
 Although the district court had appealing and persuasive equitable reasons for ruling as it did, it did not accord sufficient weight to two well-established legal principles which require a contrary result.
 
 
 11
 A. Applicability of Quiet Title Act.
 
 
 12
 First, as the district court noted, the United States holds legal title to an Indian's allotted parcel of land under the allotment system. 645 F.Supp. at 935. As appellants point out, however, the district court did not expressly consider the effect of the Quiet Title Act, 28 U.S.C. Sec. 2409a (QTA), on this case.[2] The QTA prohibits a party from suing the United States when the purpose of the suit is to challenge the government's title to land held in trust for Indians. As the Supreme Court recently stated, while examining the scope of the QTA in United States v. Mottaz, 476 U.S. 834, 106 S.Ct. 2224, 2230, 90 L.Ed.2d 841 (1986):
 
 
 13
 [The QTA] operates solely to retain the United States' immunity from suit by third parties challenging the United States' title to land held in trust for Indians. * * * Thus, when the United States claims an interest in real property based on that property's status as trust or restricted Indian lands, the Quiet Title Act does not waive the Government's immunity.
 
 
 14
 Because Marie's suit claims an interest in property to which the United States holds title, the Mottaz reasoning applies to this case, and, as discussed further, deprived the district court of jurisdiction.
 
 
 15
 The district court did not discuss the QTA, but asserted jurisdiction pursuant to 5 U.S.C. Sec. 706 of the Administrative Procedure Act (APA).[3] In our view this assertion was erroneous. In Block v. North Dakota, ex rel. Board of University and School Lands, 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983), the Supreme Court held that the QTA is the only means by which adverse claimants can challenge the United States' title to real property. Block, 461 U.S. at 286, 103 S.Ct. at 1819.
 
 
 16
 This court, in Spaeth v. United States Secretary of the Interior, 757 F.2d 937 (8th Cir.1985), has also held that the QTA bars actions to adjudicate a disputed title to Indian real property in which the United States claims an interest. The Spaeth appellants were non-Indians who sued to clear title to land they had purchased, land which was allegedly trust property. We rejected appellants' contention that section 702 of the APA provided the necessary consent for their suit against the United States, because that section provides that "[n]othing herein confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." Spaeth, 757 F.2d at 942. The Spaeth court concluded that if the United States showed a substantial possibility that the lands in dispute were "trust or restricted Indian lands," then the QTA applied to bar appellants' suit against the United States. Id. at 943.
 
 
 17
 The Supreme Court's analysis in Block that the QTA preempts review under the APA was also adopted by the Eleventh Circuit in State of Florida v. United States Department of Interior, 768 F.2d 1248 (11th Cir.1985), cert. denied, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986). In State of Florida, Florida filed a suit, asserting jurisdiction under the APA, challenging the Secretary's decision to take land in trust for the Seminole Tribe. Florida insisted that its suit was not a quiet title action because it neither sought quiet title, nor did it seek recognition of any property interest in the land at issue. Florida alleged that the APA waived the United States' immunity from suit, because section 702 of the APA waives federal sovereign immunity where the claimant seeks nonmonetary relief in a suit against federal officers.
 
 
 18
 The court rejected Florida's argument, noting:
 
 
 19
 [T]he QTA is the exclusive means by which adverse claimants can challenge the United States' title to real property. To permit otherwise, the Court reasoned [in Block ], would allow the QTA's carefully crafted limitations on the availability of relief to be circumvented, thereby rendering the Indian lands exception, among other things, null. The Court declined to consider the APA waiver of sovereign immunity as a supplemental remedy to the extent that the QTA would forbid the relief sought, invoking the exception to the APA waiver where another statute forbids the relief sought. (Citations omitted.)
 
 
 20
 State of Florida, 768 F.2d at 1254.
 
 The Eleventh Circuit continued:
 
 21
 Although technically the suit in the instant case is not one to quiet title, we conclude that Congress' decision to exempt Indian lands from the waiver of sovereign immunity impliedly forbids the relief sought here. By forbidding actions to quiet title when the land in question is reserved or trust Indian land, Congress sought to prohibit third parties from interfering with the responsibility of the United States to hold lands in trust for Indian tribes. Here, the appellants seek an order divesting the United States of its title to land held for the benefit of an Indian tribe. That appellants do not assert an adverse claim of title to the land, however, does not lessen the interference with the trust relationship a divestiture would cause. Moreover, Congress chose to preclude an adverse claimant from divesting the United States' title to Indian lands held in trust. It would be anomalous to allow others, whose interest might be less than that of an adverse claimant, to divest the sovereign of title to Indian trust lands. Hence we conclude that the APA waiver of immunity is inapplicable in this instance. (Footnotes omitted.)
 
 
 22
 State of Florida, 768 F.2d at 1254-55; see also, Wildman v. United States, 827 F.2d 1306 (9th Cir.1987).
 
 
 23
 Thus, because application of the QTA preempts application of the APA, and because the QTA does not waive the sovereign immunity of the United States as to land held in trust for Indians, we hold that the district court was without jurisdiction over this suit.
 
 
 24
 Marie argues, however, that this court's decision in Conroy v. Conroy, 575 F.2d 175 (8th Cir.1978), is controlling and should apply here. Conroy, however, fails to support her position. In Conroy, a husband and wife, both members of the Oglala Sioux Tribe, sought a divorce. During their marriage they accumulated about 1,700 acres of land which the United States held in trust for Mr. Conroy. The Oglala Tribal Court granted the divorce and awarded Mrs. Conroy roughly half the trust land. The district court and this court affirmed.
 
 
 25
 In affirming, we noted the variety of explicit provisions in the Constitution and Revised Code of the Oglala Sioux Tribe which gave the Tribe power to grant divorces and provide for the wife and children following a divorce. Because the Oglala Tribal Constitution and Code contained no provision exempting any category of property from the power of the Oglala Tribal Court, there was "no valid jurisdictional impediment to its decree." Conroy, 575 F.2d at 183. Thus, our holding in Conroy was premised in large part upon a recognition of the validity of tribal court jurisdiction as to matters involving members of its tribe.
 
 
 26
 The Conroy court next examined Mr. Conroy's contention that the provisions of the General Allotment Act which proscribed involuntary alienation of allotments in trust thereby removed trust land from the reach of the Tribal Court. Id. In examining the question, this court noted that the purpose of the Act was to protect Indians. We concluded that the Act would not "negate a valid decree of a competent [tribal] tribunal," because the Act did not "support the denial to an Indian * * * of her rightful claim to valuable property." Id. (Emphasis added.)
 
 
 27
 Thus the key difference between Conroy and this case is that in Conroy, the Tribal Court's partition of the trust property between two Indians did not divest the United States of its legal title to the property as trustee, but merely substituted different Indian beneficiaries. Consequently, it was not necessary to join the United States to that action. See Conroy, 575 F.2d at 178, 180. Here, however, enforcing the district court's order would divest the United States of its trust responsibility over the land awarded to Marie. Because, as discussed above, no court has jurisdiction to divest the United States of land held in trust for Indians, Marie's suit must fail.
 
 
 28
 B. Authority to Override a Valid Will.
 
 
 29
 Assuming arguendo that the jurisdictional issue were not dispositive in this case, the district court was without authority to override Douglas' valid will.[4] The Supreme Court has spoken clearly on this issue in two cases.
 
 
 30
 In Blanset v. Cardin, 256 U.S. 319, 41 S.Ct. 519, 65 L.Ed. 950 (1921), an Indian woman left a will disposing of allotted land which did not include her husband as a beneficiary. Her husband, a non-Indian, sought a one-third interest in the land under state law. The Supreme Court held that the husband had no interest in the land, stating conclusively:
 
 
 31
 In a word, the act of Congress [25 U.S.C. Sec. 373, governing the validity of Indian wills] is complete in its control and administration of the allotment and of all that is connected with or made necessary by it, and is antagonistic to any right or interest in the husband of an Indian woman in her allotment under the Oklahoma Code.
 
 
 32
 Blanset, 256 U.S. at 326, 41 S.Ct. at 522.
 
 The Court continued:
 
 33
 [I]t was the intention of Congress that this class of Indians should have the right to dispose of property by will under this act of Congress, free from restrictions on the part of the State as to the portions to be conveyed or as to the objects of the testator's bounty, provided such wills are in accordance with the regulations and meet the approval of the Secretary of the Interior.
 
 
 34
 Id. at 326-27, 41 S.Ct. at 522.
 
 
 35
 More recently, in Tooahnippah v. Hickel, 397 U.S. 598, 90 S.Ct. 1316, 25 L.Ed.2d 600 (1970), the Supreme Court overturned the Secretary of the Interior's invalidation of an Indian's will. In his will the Indian testator had left nothing to his daughter, and the Secretary concluded that it would be inappropriate to "perpetuate this utter disregard for the daughter's welfare * * *." Tooahnippah, 397 U.S. at 602, 90 S.Ct. at 1319. The Supreme Court stated:
 
 
 36
 To sustain the administrative action performed on behalf of the Secretary would, on this record, be tantamount to holding that a public officer can substitute his preference for that of an Indian testator. * * * [W]e cannot assume that Congress, in giving testamentary power to Indians respecting their allotted property with the one hand, was taking that power away from the other by vesting in the Secretary the same degree of authority to disapprove such a disposition.
 
 
 37
 * * *
 
 
 38
 * * *
 
 
 39
 Whatever may be the scope of the Secretary's power to grant or withhold approval of a will under 25 U.S.C. Sec. 373, we perceive nothing in the statute or its history or purpose that vests in a governmental official the power to revoke or rewrite a will that reflects a rational testamentary scheme with a provision for a relative who befriended the testator and omission of one who did not, simply because of a subjective feeling that the disposition of the estate was not "just and equitable." (Footnote omitted.)
 
 
 40
 Id. at 608-10, 90 S.Ct. at 1322-23.
 
 
 41
 In Akers v. Morton, 499 F.2d 44 (9th Cir.1974), cert. denied, 423 U.S. 831, 96 S.Ct. 51, 46 L.Ed.2d 48 (1975), the Ninth Circuit confronted a situation similar to that presented here. Mr. Akers, an Indian, expressly disinherited his wife, also an Indian, from his will. Mrs. Akers asserted a dower right in the land conveyed by the will, land that had been acquired with her funds, but which had been titled as trust land in Mr. Akers' name. The Ninth Circuit held that even though the results were often inequitable, "[a]lienation of restricted Indian allotment land is controlled by federal law. Montana's dower law cannot of its own force entitle Mrs. Akers to claim a wife's interest in her deceased husband's restricted lands." Akers, 499 F.2d at 46. The court later stated: "The Secretary may disapprove a will only if it is technically deficient or if it is irrational. Where, as in this case, it is rational * * *, the Supreme Court has indicated that the Secretary is not free to disapprove the will merely on notions of fairness or equity." Id. at 47, citing Tooahnippah, 397 U.S. at 610, 90 S.Ct. at 1323.
 
 
 42
 We believe this clear line of cases compels the conclusion that the district court erred in overriding the explicit provisions of Douglas' validly-executed will. Accordingly, we reverse the decision of the district court and reinstate the decision of the Secretary of the Interior.
 
 
 
 [1]
 Under the allotment system, created by the Indian General Allotment Act of February 8, 1887, Ch. 119, 24 Stat. 388, as amended, 25 U.S.C. Sec. 331 et seq., the United States gave Indians allotments, or parcels, of former reservation land, in order to assimilate them into white society by familiarizing them with property ownership and cultivation. To protect the Indian property owner from unscrupulous acquisitions, the United States held legal title to the parcels in trust for the Indian. The land remains exempt from state and local taxes during the trust period. See Nichols v. Rysavy, 809 F.2d 1317, 1320-23 (8th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 147, 98 L.Ed.2d 103 (1987), for a more in-depth discussion of the allotment system
 
 
 [2]
 The QTA provides, in pertinent part:
 (a) The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights. This section does not apply to trust or restricted Indian lands * * *. (Emphasis added.)
 
 
 [3]
 Section 706 of the APA generally gives a district court the power to review agency action
 
 
 [4]
 25 U.S.C. Sec. 373, which governs the disposal by will of allotments held under trust, provides in pertinent part:
 Any persons of the age of twenty-one years having any right, title, or interest in any allotment held under trust or other patent containing restrictions on alienation or individual Indian moneys or other property held in trust by the United States shall have the right prior to the expiration of the trust or restrictive period, and before the issuance of a fee simple patent or the removal of restrictions, to dispose of such property by will, in accordance with regulations to be prescribed by the Secretary of the Interior: Provided, however, That no will so executed shall be valid or have any force or effect unless and until it shall have been approved by the Secretary of the Interior:
 * * *
 Provided further, That the approval of the will and the death of the testator shall not operate to terminate the trust or restrictive period * * *. (Emphasis in original.)