STATE OF SOUTH DAKOTA; City of Oacoma, South Dakota, Plaintiffs–Appellants,

v.

UNITED STATES DEPARTMENT OF the INTERIOR; Eddie F. Brown, Assistant Secretary–Indian Affairs; Jerry Jaeger, Acting Area Director, Bureau of Indian Affairs, Defendants–Appellees.

No. 94–2344.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 15, 1995.

Decided Nov. 7, 1995.

John P. Guhin, Assistant Attorney General, Pierre, South Dakota, argued (Steven R. Smith, on the brief), for appellant.

Lisa E. Jones, U.S. Department of Justice, Washington, D.C., argued (Mikal G. Hanson, Edward J. Shawaker and Andrea Nervi Ward, on the brief), for appellee.

Before MAGILL, LOKEN, and MURPHY, Circuit Judges.

LOKEN, Circuit Judge.

The State of South Dakota and the City of Oacoma, South Dakota, appeal the district court's dismissal of their challenge to the Secretary of the Interior's acquisition of commercial land in trust for the Lower Brule Tribe of Sioux Indians. Concluding that 25 U.S.C. § 465, the statute authorizing acquisition of the land, is an unconstitutional delegation of legislative power, we reverse.

## I.

In March 1990, the Tribe submitted an application under 25 U.S.C. § 465, asking the Secretary to acquire ninety-one acres of land in trust for use by the Tribe. The land is located seven miles from the Tribe's reservation and is partially within the City of Oacoma. The Tribe stated that the land would be used to create an industrial park adjacent to an interstate highway, explaining that "[t]his site, Trust status for the land, and tax advantages are critically necessary for the development to occur."

The State of South Dakota and the City of Oacoma protested in writing to the Secretary's Bureau of Indian Affairs ("BIA"). When BIA's Area Director notified the State and the City in March 1991 that the Tribe's application would be approved, they appealed to the Interior Board of Indian Affairs. BIA then disclosed that the Assistant Secretary for Indian Affairs had approved the application in December 1990, without notifying the protestants. The Board dismissed the appeal because it has no jurisdiction to review decisions by the Assistant Secretary. *State of South Dakota & Town of Oacoma v. Aberdeen Area Director, BIA,* 22 I.B.I.A. 126 (1992).

In July 1992, the State and the City filed this action against the Department of the Interior and certain of its officials seeking judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 701–706. For convenience, we will refer to the defendants collectively as "the Secretary," because he is the Executive Branch official authorized to act under § 465. We will refer to the State and the City collectively as "plaintiffs."

Plaintiffs allege that they are aggrieved by the Secretary's acquisition because it deprives them of tax revenues and may place the land beyond their regulatory powers. They contend that the acquisition is invalid because § 465 is an unconstitutional delegation of legislative power. Alternatively, they contend (i) that the agency violated its internal rules of procedure and the Assistant Secretary acted beyond the scope of his delegated authority; (ii) that the approval was arbitrary and capricious and not in accordance with the agency's governing regulations, *see* 25 C.F.R. §§ 151.1–.14; and (iii) that the Tribe plans to develop the land as a gaming casino and the Secretary was aware of the Tribe's true intentions but failed to comply with the approval procedures of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721.

In November 1992, the Secretary took title to the lands in trust for the Tribe. In January 1994, the Secretary moved to dismiss on the ground that a § 465 acquisition is action "committed to agency discretion by law" and therefore not subject to judicial review. *See* 5 U.S.C. § 701(a)(2); *Heckler v. Chaney,* 470 U.S. 821, 828–30, 105 S.Ct. 1649, 1654–55, 84 L.Ed.2d 714 (1985). The district court granted the motion to dismiss, concluding that § 465 is not an unconstitutional delegation of legislative power because the statute identifies the agency to which power is delegated and "clearly delineates the general policy to be applied and the bounds of that delegated authority." Without reaching the "committed to agency discretion" issue, the court also held, *sua sponte,* that it had no jurisdiction to review plaintiffs' other claims because the

Quiet Title Act, 28 U.S.C. § 2409a, which permits the United States to be sued to resolve real property disputes, "does not apply to trust or restricted Indian lands."[1]

## II.

On appeal, plaintiffs argue that § 465 provides no legislative standards or boundaries governing the Secretary's acquisitions. The Secretary responds that the statutory purpose of "providing land for Indians" sufficiently defines the general policy and boundaries of the delegated power. The Secretary notes that the Supreme Court has not invalidated a federal statute on delegation grounds since *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 542, 55 S.Ct. 837, 848, 79 L.Ed. 1570 (1935), and *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). Interestingly, the same Congress enacted both the Indian Reorganization Act, of which § 465 was a part, and the statutes invalidated in *Schechter Poultry* and *Panama Refining.* It is appropriate to consider whether § 465 satisfies the nondelegation doctrine as it has evolved since 1935, particularly because no other appellate court has done so.[2]

■ The nondelegation doctrine is easy to state: "Congress may not constitutionally delegate its legislative power to another branch of Government." *Touby v. United States,* 500 U.S. 160, 165, 111 S.Ct. 1752, 1755, 114 L.Ed.2d 219 (1991) (citation omitted). It is difficult to apply. A court must inquire whether Congress "has itself established the standards of legal obligation, thus performing its essential legislative function." *Schechter Poultry,* 295 U.S. at 530, 55 S.Ct. at 843. But the court must be mindful that the doctrine does not prevent Congress from obtaining the assistance of its coordinate Branches. Therefore, so long as Congress

"lay[s] down by legislative act an intelligible principle" governing the exercise of delegated power, it has not unlawfully delegated its legislative power. *J.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928), quoted in *Touby,* 500 U.S. at 165, 111 S.Ct. at 1755, and *Mistretta v. United States,* 488 U.S. 361, 372, 109 S.Ct. 647, 655, 102 L.Ed.2d 714 (1989). A delegation is overbroad "[o]nly if we could say that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Yakus v. United States,* 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944).

■ The Supreme Court has recognized that judicial review is a relevant safeguard in considering delegation issues:

It is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority. Private rights are protected by access to the courts to test the application of the policy in the light of these legislative declarations."

*Skinner v. Mid–America Pipeline Co.,* 490 U.S. 212, 219, 109 S.Ct. 1726, 1731, 104 L.Ed.2d 250 (1989), *quoting American Power & Light Co. v. SEC,* 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946). Justice Marshall eloquently stated this principle in his concurring opinion in *Touby:* "judicial review perfects a delegated-lawmaking scheme by assuring that the exercise of such power remains within statutory bounds." 500 U.S. at 170, 111 S.Ct. at 1758. Thus, when the Secretary argued to the district court that his actions under § 465 may not be judicially reviewed *because the statute commits them*

---

1. The court relied on *State of Florida v. United States Dep't of the Interior,* 768 F.2d 1248 (11th Cir.1985), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986). *Contra, City of Sault Ste. Marie v. Andrus,* 458 F.Supp. 465, 470–72 (D.D.C.1978). We doubt whether the Quiet Title Act precludes APA review of agency action by which the United States *acquires* title. But given our conclusion that § 465 is an unconstitutional delegation of power, we need not decide this issue. The court in *Florida* conceded that

the Quiet Title Act does not bar claims "that the Secretary acted unconstitutionally or beyond his statutory authority when the United States acquired title to the land." 768 F.2d at 1255 n. 9.

2. To our knowledge, only one other district court has considered the nondelegation question in the sixty-year life of the statute, and its perfunctory analysis is unpersuasive. *See City of Sault Ste. Marie,* 458 F.Supp. at 473.

*entirely to agency discretion,* he implicitly acknowledged that this delegation issue requires a particularly close look. *See United States v. Garfinkel,* 29 F.3d 451, 459 (8th Cir.1994) ("[J]udicial review is a factor weighing in favor of upholding a statute against a nondelegation challenge") (citation omitted).

■ We begin by examining the very broad language of § 465:

> The Secretary of the Interior is hereby authorized, in his discretion, to acquire . . . any interest in lands . . . within or without existing reservations . . . for the purpose of providing land for Indians.
>
> \* \* \* \* \* \*
>
> Title to any lands or rights acquired . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

By its literal terms, the statute permits the Secretary to purchase a factory, an office building, a residential subdivision, or a golf course in trust for an Indian tribe, thereby removing these properties from state and local tax rolls. Indeed, it would permit the Secretary to purchase the Empire State Building in trust for a tribal chieftain as a wedding present. There are no perceptible "boundaries," no "intelligible principles," within the four corners of the statutory language that constrain this delegated authority—except that the acquisition must be "for Indians." It delegates unrestricted power to acquire land from private citizens for the private use and benefit of Indian tribes or individual Indians.

■ The Secretary's power to purchase land under § 465 triggers the complementary power to acquire land by condemnation under 40 U.S.C. § 257. *See United States v. 29 Acres of Land,* 809 F.2d 544, 545 (8th Cir.1987). It is therefore appropriate to consider the delegation question in the context of the federal government's extensive condemnation powers.

■ The power to acquire land by condemnation for a public purpose is an inherent aspect of sovereignty. *See Kohl v. United States,* 91 U.S. 367, 371–72, 23 L.Ed. 449 (1875). In exercising that power, Congress need not select the particular land to be taken; that function may be delegated to the Executive Branch. *See Chappell v. United States,* 160 U.S. 499, 510, 16 S.Ct. 397, 400, 40 L.Ed. 510 (1896). So long as the condemnation serves a public use, "the necessity or expediency of appropriating any particular property is not a subject of judicial cognizance." *Mississippi & Rum River Boom Co. v. Patterson,* 98 U.S. 403, 406, 25 L.Ed. 206 (1878). However, "a claim that a taking is not 'for public use' is open for judicial consideration." *United States ex rel. T.V.A. v. Welch,* 327 U.S. 546, 557, 66 S.Ct. 715, 720, 90 L.Ed. 843 (1946) (Frankfurter, J., concurring).

■ It is settled that the United States may purchase land by condemnation for an Indian reservation as a public use. *See United States v. McGowan,* 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938); *State of Minnesota v. United States,* 125 F.2d 636, 640 (8th Cir.1942). That same power authorizes Congress to acquire non-reservation lands in trust for a public use that benefits Indians or Indian tribes. But the question under the nondelegation doctrine is, for what public use does § 465 authorize the Secretary to acquire land. By defining no boundaries to the exercise of this power, the statute leaves the Secretary free to acquire for a multitude of purposes, for example, to expand a reservation,[3] to provide farm land for rural Indians, to provide a factory for unemployed urban Indians, to provide a golf course for tribal recreation, or to provide a lake home for a politically faithful tribal officer. These are very different public uses, and the last is, of course, no public use at all.

Despite the government's broad, inherent power to acquire land for public use, the nondelegation doctrine surely requires at a

---

**3.** A separate provision of the Indian Reorganization Act specifically authorized the Secretary to acquire lands to form new reservations or to enlarge existing reservations. *See* 25 U.S.C.

§ 467. In *State of Minnesota, supra,* we upheld a condemnation under a different, far more specific statute after careful judicial review of the Secretary's decision.

minimum that Congress, not the Executive, articulate and configure the underlying public use that justifies an acquisition. In some cases, the public use underlying each acquisition is obvious, as when Congress authorizes an agency to acquire lands and buildings to house the agency's operations. But when Congress authorizes the Secretary to acquire land in trust "for Indians," it has given the agency no "intelligible principle," no "boundaries" by which the public use underlying a particular acquisition may be defined and judicially reviewed. This legislative vacuum in turn greatly expands the extent of the standardless delegation.

## III.

The legislative history of § 465 suggests that Congress did not intend to delegate unrestricted power to acquire land "for Indians." The statute was enacted as section 5 of the Indian Reorganization Act of 1934, 48 Stat. 985. The Report of the Committee on Indian Affairs stated:

> The bill now under consideration definitely puts an end to the allotment system through the operation of which the Indians have parted with 90,000,000 acres of their land in the last 50 years.... To make many of the now pauperized, landless Indians self-supporting, it authorizes a long term program of purchasing land for them.

> \* \* \* \* \* \*

> Section 5 authorizes the Secretary of the Interior to purchase or otherwise acquire land for landless Indians.

> The title to land thus acquired will remain in the United States. The Secretary may permit the use and occupancy of this newly acquired land by landless Indians; he may loan them money for improvements and cultivation, but the continued occupancy of this land will depend on its beneficial use by the Indian occupant and his heirs.

H.R.Rep. No. 1804, 73d Cong., 2d Sess. 6–7 (1934). In the House floor debate, Representative Howard, a chief sponsor of the bill, further explained the purpose of section 5:

> Section 5 sets up a land acquisition program to provide land for Indians who have no land or insufficient land, and who can use land beneficially.... This program would permit the purchase of land for many bands and groups of landless Indians and would permit progress toward the consolidation of badly checkerboarded Indian reservations, as well as provide additional agricultural land to supplement stock grazing or forestry operations.

78 Cong.Rec. 11730 (June 15, 1934). Representative Howard characterized the acquisition of trust lands to be used for farming as "the keystone of the new Indian policy." 78 Cong.Rec. 11729. Representative Hastings described the land to be acquired as "Indian subsistence-homesteads." *Id.* at 9269.

■ This agrarian focus is not surprising in a Congress acting against the backdrop of an industrial sector ravaged by the Great Depression. Yet in drafting § 465, Congress failed to include standards to reflect its limited purpose. Instead, the Secretary was delegated unrestricted power to acquire land "for Indians" in a statute that contained no "boundaries" defining how that power should be exercised. The Secretary has responded by asserting all of the unlimited power conferred by the statute's literal language. First, he promulgated regulations that place no restrictions on the purpose for which land may be placed in trust "for Indians." *See* 25 C.F.R. § 151.10. Second, when his acquisition procedures and decisions were challenged in court, he asserted that his exercise of this power is not subject to judicial review under the APA because it is "committed to agency discretion."

This case illustrates the problems created by the exercise of such unrestricted power. Intending only that the Secretary acquire rural lands suitable for farming, grazing, and logging by Indians, Congress in § 465 addressed only one intergovernmental issue—it made the lands taken in trust exempt from state and local property taxes. But when the Secretary acquires urban land for industrial or commercial uses, other important issues inevitably arise. For example, the South Dakota Attorney General asked the Secretary whether the City of Oacoma's ordinances, including its zoning ordinances, would be enforceable against the property if

it was taken in trust. The Secretary's Field Solicitor responded:

> If the parcel is not declared to be part of the reservation, then ordinances which are civil or regulatory in nature and which do not affect the proprietary interest of the United States, acquired by virtue of acquisition of title to the land, *may* apply. *See State of Florida, supra; Mescalero Apache Tribe v. Jones,* [411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) ].

(Emphasis added.) This answer suggests that the BIA will force the State and the City to establish their right to regulate the trust land in court, where BIA will no doubt argue that state and local regulatory powers are preempted. The result is a legislative void. Congress, not the BIA, and indeed not the courts, should define in the first instance the extent to which lands taken in trust for industrial and commercial Indian use are thereby freed from state and local zoning ordinances, building codes, health and safety regulations, and other exercises of the police power.

Had the Secretary acted consistently with § 465's legislative history—by limiting his acquisition authority to purposes such as forming or enlarging reservations, restoring alienated allotment lands, and providing other lands for agrarian uses—we would face the question whether the statute's overbreadth was suitably slimmed by this legislative history and agency interpretation. Normally, delegation questions are considered in light of a statute's legislative history and context, *see Garfinkel,* 29 F.3d at 458, and any narrowing agency interpretation, *see International Union, UAW v. OSHA,* 938 F.2d 1310 (D.C.Cir.1991); 37 F.3d 665 (D.C.Cir. 1994) (decision after remand). But in this case, the agency has interpreted the statute as broadly as possible, consistent with its literal language. We have approved that interpretation in another context and as a panel may not overrule a prior panel opinion. *See Chase v. McMasters,* 573 F.2d 1011, 1015–16 (8th Cir.1978), *cert. denied,* 439 U.S. 965, 99 S.Ct. 453, 58 L.Ed.2d 423 (1978). Moreover, if we now took a more limited view of the statute, the Secretary's regulations would be overbroad, and there would be

no basis upon which to uphold this acquisition. Thus, we conclude that we must accept the agency's interpretation and construe the statute literally for purposes of applying the nondelegation doctrine.

## IV.

■ There are additional, procedural aspects of the Secretary's acquisition program that further support our decision. The administrative record reveals that the Tribe purchased the land in question for $80,255.94, three months *after* it filed the § 465 application, and after the BIA's Lower Brule Agency had recommended favorable action on the application. The record does not disclose (i) whether the purchase price was based upon tax free commercial use by the Tribe, and (ii) the price the United States paid when it acquired the land from the Tribe in November 1992. Plaintiffs criticize the administrative record as contrived and inadequate. The Secretary argues that procurement practices of the Tribe and BIA under § 465 are not subject to judicial review.

There are many opportunities for abuse in a program of this nature. For example, a seller who knows that land is being sold for a tax free use will charge more for that land, thereby capturing some of the economic benefit of tax free status that Congress intended for the Indians. Here, if the Tribe paid such a monopoly rent, the congressional purpose has been frustrated. But if the Secretary reimbursed the Tribe for that purchase price, the taxpayers have suffered from agency ignorance or misfeasance. Given the extensive standards that Congress has built into other procurement programs, *see, e.g.,* 10 U.S.C. Ch. 159; 41 U.S.C. §§ 251–260, the total absence of procurement principles and safeguards in § 465 violates the nondelegation doctrine.

## V.

Those who drafted § 465 failed to incorporate the limited purpose reflected in the legislative history. Presumably, they either drafted poorly or ignored the delegation issue. The agency that received this inartful delegation then used the absence of statutory controls to claim unrestricted, unreviewable

power. The result is an agency fiefdom whose boundaries were never established by Congress, and whose exercise of unrestrained power is free of judicial review. It is hard to imagine a program more at odds with separation of powers principles.

 In his concurring opinion in *Industrial Union Dept., AFL–CIO v. American Petroleum Inst.,* 448 U.S. 607, 685–86, 100 S.Ct. 2844, 2886, 65 L.Ed.2d 1010 (1980), Justice (now Chief Justice) Rehnquist summarized the functions of the nondelegation doctrine as articulated in prior Supreme Court cases:

> First, and most abstractly, it ensures to the extent consistent with orderly governmental administration that important choices of social policy are made by Congress, the branch of our Government most responsive to the popular will. Second, the doctrine guarantees that, to the extent Congress finds it necessary to delegate authority, it provides the recipient of that authority with an "intelligible principle" to guide the exercise of the delegated discretion. Third, and derivative of the second, the doctrine ensures that courts charged with reviewing the exercise of delegated discretion will be able to test that exercise against ascertainable standards.

(Citations omitted.) We conclude that § 465 fails all three of these nondelegation criteria and is invalid. Accordingly, the Secretary had no authority to acquire the lands in question in trust for the Tribe. The judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

MURPHY, Circuit Judge, dissenting.

The court in this case unnecessarily reaches a constitutional issue and bases its conclusions on speculation rather than the record. Its decision that a portion of the Indian Reorganization Act of 1934, 25 U.S.C. § 465, is an unconstitutional delegation of legislative power is not supported by the statute or its legislative history. The court invalidates today a congressional enactment designed to acquire land in trust for Indians that has been in place for over sixty years and, in the process, places in doubt the status of all Indian trust land. I must therefore dissent.

I.

The primary focus of the appeal taken by the State of South Dakota and the City of Oacoma (plaintiffs) is the district court's dismissal for lack of jurisdiction of their claims brought under the Administrative Procedure Act (APA), 5 U.S.C. § 701–706. The Department of the Interior and the two individually named defendants (collectively, the Secretary) had argued on their motion to dismiss that judicial review of the APA claims is unavailable because the decision whether to acquire land in trust is committed to agency discretion. Plaintiffs disagreed and also challenged the constitutionality of the statute authorizing land to be taken into trust, § 465 of the Indian Reorganization Act. The district court found the statute to be constitutional and did not reach the issue of the availability of judicial review. Instead it concluded sua sponte that it lacked jurisdiction over the APA claims because the United States has not waived its sovereign immunity for claims relating to Indian trust land.

Rather then addressing the jurisdictional issue, the majority stretches to consider the constitutionality of the underlying statute. A cardinal principle guiding federal courts is that constitutional issues should not be reached unless necessary to a decision. *Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2996–97, 86 L.Ed.2d 664 (1985). This is a "fundamental rule of judicial restraint." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering,* 467 U.S. 138, 157, 104 S.Ct. 2267, 2279, 81 L.Ed.2d 113 (1984). The court suggests, but does not decide, that the district court had jurisdiction to consider the claims brought under the APA. If so, the principle of judicial restraint should lead to consideration of those claims prior to reaching any constitutional issue. Resolution of the constitutional question would not be required if the merits of the APA claims were to be determined in favor of the plaintiffs.

Moreover, resolution of the APA inquiry could inform the analysis of the delegation issue since the availability of judicial review of an agency action is relevant in determin-

ing whether the authorizing statute is a lawful delegation. *See United States v. Garfinkel,* 29 F.3d 451, 459 (8th Cir.1994). Although the court recognizes this principle, it relies on the Secretary's mere assertion that his decision is unreviewable to support its conclusion that the delegation is unlawful.

## II.

Even if the court had reason to address the delegation issue at this time, its decision strays far from the existing path of nondelegation doctrine. Congressional delegations of legislative power are valid "if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Mistretta v. United States,* 488 U.S. 361, 372–73, 109 S.Ct. 647, 655, 102 L.Ed.2d 714 (1989) (quoting *American Power & Light Co. v. SEC,* 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946)). To assess whether a statute imposes sufficient boundaries on the delegated authority, a reviewing court looks at the language of the statute, its purpose and factual background, and the statutory context in which the standards appear. *United States v. Garfinkel,* 29 F.3d 451, 458 (8th Cir.1994) (citing *American Power & Light Co. v. SEC,* 329 U.S. 90, 104, 67 S.Ct. 133, 141–42, 91 L.Ed. 103 (1946)). A statute written in broad terms does not violate the Constitution so long as Congress lays down an "intelligible principle" to guide the agency's discretion. *Touby v. United States,* 500 U.S. 160, 165, 111 S.Ct. 1752, 1755–56, 114 L.Ed.2d 219 (1991); *Garfinkel,* 29 F.3d at 457.

Only twice in its history, and not since 1935, has the Supreme Court invalidated a statute on the ground of excessive delegation of legislative authority. Since 1935, the Supreme Court has consistently upheld statutes involving broad delegations of authority. *See e.g., Mistretta v. United States,* 488 U.S. 361, 372–73, 109 S.Ct. 647, 654–55, 102 L.Ed.2d 714 (1989) (authority to promulgate sentencing guidelines for federal criminal offenses); *Lichter v. United States,* 334 U.S. 742, 785–86, 68 S.Ct. 1294, 1316–17, 92 L.Ed. 1694 (1948) (authority to determine excessive profits); *American Power & Light Co. v. SEC,* 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946) (authority to prevent unfair or inequitable distribution of voting power among security holders); *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (authority to fix commodity prices that would be fair and equitable and would effectuate purpose of Emergency Price Control Act of 1942); *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 600, 64 S.Ct. 281, 286–87, 88 L.Ed. 333 (1944) (authority to determine just and reasonable rates); *National Broadcasting Co. v. United States,* 319 U.S. 190, 225–26, 63 S.Ct. 997, 1013, 87 L.Ed. 1344 (1943) (authority to regulate broadcast licensing for "public interest, convenience, or necessity"). The delegation doctrine has in fact evolved into a tool of statutory construction, by which reviewing courts give "narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional." *See Mistretta,* 488 U.S. at 373 n. 7, 109 S.Ct. at 655 n. 7.

Although the court notes that the same Congress passed the Indian Reorganization Act and the statutory provisions found unconstitutional in 1935 on delegation grounds, it does not attend to the striking differences between the statutes. The National Industrial Recovery Act (NIRA), 48 Stat. 195 (1933),[1] contained the unconstitutional provisions struck down in *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 531, 55 S.Ct. 837, 843–44, 79 L.Ed. 1570 (1935) (provision authorizing the President to approve codes of fair competition for a trade or industry) and *Panama Refining Co. v. Ryan,* 293 U.S. 388, 406, 55 S.Ct. 241, 242, 79 L.Ed. 446 (1935) (provision granting the President discretion to prohibit interstate and foreign commerce of certain petroleum products). The NIRA represented the Roosevelt administration's response to a national emergency caused by widespread unemployment and economic disruption during the Depression. *See* 48 Stat. 195, Title I, section 1. It granted the President unfettered discretion to approve any law, and impose his own conditions

---

1. This statute was later amended by 49 Stat. 375 (1935), which repealed the provisions relating to codes of fair competition and provided for the expiration of Title I of the Act in 1936.

on it, relating to a "vast array of commercial and industrial activities throughout the country." *Schechter,* 295 U.S. at 539, 55 S.Ct. at 847. The Indian Reorganization Act in contrast did not convey such unbridled discretion to another branch, and it is one of a long line of enactments reflecting the special role the federal government has played with respect to Indian tribes. *See* F. Cohen, *Handbook of Federal Indian Law* 68–88 (reprint ed. 1988) (reviewing federal Indian legislation starting from 1789).

The court today departs from precedent like *Mistretta* by invalidating a statute as an unlawful delegation based on the broadest possible reading of its terms. In the course of its discussion, it focuses on unlikely hypothetical uses of the Secretary's delegated authority and ignores the limiting effect of the context in which the statute was passed.

Prior to 1934, Congress pursued an allotment policy with regard to Indian land. *See id.* at 78–83. Existing Indian tribal land was allotted to individual Indians, and surplus lands were sold to whites. Although the purpose of the policy was to encourage assimilation, it resulted most significantly in the loss of Indian land as individual allotments were sold to non-Indians, lost through tax forfeiture or otherwise alienated. *See Shangreau v. Babbitt,* 68 F.3d 208 (8th Cir. 1995). Between 1887 and 1934, Indian land holdings were reduced from 138 million acres to 48 million, a loss of 90 million acres. F. Cohen, *Handbook of Federal Indian Law* 138 (1982 ed.).

Discontent with the allotment policy caused Congress to enact the Indian Reorganization Act of 1934, 25 U.S.C. § 461–479, to stem the loss of Indian lands and to assist Indians in acquiring land adequate for self-support. *See Chase v. McMasters,* 573 F.2d 1011, 1016 (8th Cir.), *cert. denied,* 439 U.S. 965, 99 S.Ct. 453, 58 L.Ed.2d 423 (1978). The purpose of the Act was "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 152, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114 (1973) (quoting H.R.Rep. No. 1804, 73d Cong.2d Sess., 1 (1934)). The Act rejected assimilation as a goal and instead sought Indian self-determination. The portion of the Act under attack here, 25 U.S.C. § 465, specifically addresses the problem of the loss of Indian land and authorizes the Secretary to acquire land in trust "for the purpose of providing land for Indians."

The text of the Act gives the Secretary broad discretion to acquire land in trust, but it also limits that discretion explicitly. It directs that any land acquired must be for Indians as they are defined in 25 U.S.C. § 479. It authorizes the appropriation of a limited amount of funds with which land could be acquired and specifically prohibits use of such funds to acquire land for the Navajo Indians outside of their established reservation boundaries in Arizona and New Mexico.

The court's conclusion that the statutory language does not give the Secretary adequate direction ignores the Act's historical context. Although § 465 uses broad language, its direction that land be acquired "for the purpose of providing land for Indians," has specific meaning in light of the failure of the allotment policy and Congressional rejection of assimilation as a goal. It instructs the Secretary that land should be acquired to replace the millions of acres of Indian land lost as a result of the allotment policy and placed in trust to prevent its alienation. This interpretation is reinforced by related provisions in the Act which specifically prohibit features of the allotment system. Such provisions, for example, prohibit allotment of reservation land to individual Indians, 25 U.S.C. § 461, extend existing periods of trust and restrictions on alienation on any Indian lands, 25 U.S.C. § 462, authorize restoration of surplus lands to tribal ownership, 25 U.S.C. § 463, and prohibit the transfer of restricted Indian lands except to Indian tribes. 25 U.S.C. § 464.

The Secretary's authority is also limited by the guidance provided in the legislative history of the Indian Reorganization Act. *See Mistretta,* 488 U.S. at 376 n. 10, 109 S.Ct. at 657 n. 10. That history explains that § 465 was enacted in response to the loss of 90 million acres that resulted from the operation of the allotment system, H.R.Rep. No. 1804,

73d Cong.2d Sess., 6 (1934), and identifies goals of "rehabilitat[ing] the Indian's economic life" and "develop[ing] the initiative destroyed by ... oppression and paternalism." *Mescalero,* 411 U.S. at 152, 93 S.Ct. at 1272. Its various provisions were designed to encourage tribal enterprise and enable Indians "to enter the white world on a footing of equal competition." *Id.* at 157, 93 S.Ct. at 1275, citing 78 Cong.Rec. 11732. The legislative history also directs that after land is acquired in trust, the Secretary must assure continued "beneficial use by the Indian occupant and his heirs." H.R.Rep. No. 1804 at 7. *See also City of Tacoma v. Andrus,* 457 F.Supp. 342 (D.D.C.1978).

The availability of judicial review of the Secretary's actions may also serve to limit the delegation here. *See Garfinkel,* 29 F.3d at 459. Judicial review "is a factor weighing in favor of upholding a statute against a nondelegation challenge." *Id.* The majority focuses on the Secretary's claim that such review is not available under the APA in this case, but does not consider the issue, which has not yet been developed in the trial court.

The majority chooses to disregard the limits on the Secretary's authority and the principles that guide the exercise of his discretion. It claims that it cannot consider narrowing constructions because it is bound by the holding in *Chase v. McMasters,* 573 F.2d at 1015–16. *Chase* did not hold that § 465 grants the Secretary unlimited authority to acquire land, however, but merely rejected the suggestion that the authority is limited to acquiring land for landless Indians and concluded that § 465 authorized the Secretary to accept conveyance of title to land already owned in fee by an Indian.

Although the court recognizes that it is bound by the holding in *Chase,* it rejects the interpretation there of the legislative history of § 465 when it claims that Congress meant only to provide agrarian land for landless Indians. It states its own view that Congress only intended "that the Secretary acquire rural lands suitable for farming, grazing, and logging by Indians." Not only is this interpretation of the legislative history contrary to *Chase,* but the majority's approach turns the nondelegation doctrine on its head. Instead of using the legislative history to inform its reading of the statute, the court uses it in an attempt to establish a line beyond which authority could not lawfully be delegated. The relevant question for the nondelegation doctrine, however, is whether the statute contains sufficient standards to meet the constitutional requirement of specificity.

Plaintiffs' allegations raise state and local concerns related to taxation and regulation of land and possible gambling operations. These concerns appear to have influenced the majority, but they are not directly relevant to the constitutional analysis. Whether federal policy should support the taking of land into trust for Indian tribes is up to the other branches of government, not the judiciary.

In its discussion the court does not limit itself to the specific land acquisition at issue in this case, but instead hypothesizes that the Secretary, as head of an "agency fiefdom," may "purchase the Empire State Building in trust for a tribal chieftain as a wedding present" or "provide a lake home for a politically faithful tribal officer." This is pure speculation. Whether such transactions would be permissible under the statute are not questions raised by this case, and the Secretary's regulations make it unlikely that such scenarios could arise.[2]

The record indicates that the land at issue here was part of the Tribe's original reserva-

---

**2.** Contrary to the court's assertion that the Secretary has asserted "unlimited power," the regulations reflect the Congressional concern that the land be acquired for the benefit of Indians. 25 C.F.R. § 151.1–151.15. The Department's land acquisition policy for tribes and for individual Indians is stated in 25 C.F.R. § 151.3:

 (a) Subject to the provisions contained in the acts of Congress which authorize land acquisitions, land may be acquired for a tribe in trust status

1) when the property is located within the exterior boundaries of the tribe's reservation or adjacent thereto, or within a tribal consolidation area; or,

2) when the tribe already owns an interest in the land[;] or,

3) when the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing.

 (b) Subject to the provisions contained in the acts of Congress which authorize land acquisitions or holding land in trust or restricted

tion, but was later lost. The land was purchased by the Tribe after it had been zoned for industrial purposes, and the Tribe stated that it intended to develop an industrial park on it. Any attempt to develop a gambling casino on trust land would be subject to the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, which requires both consideration by the Secretary of various factors and approval by the governor of the State. 25 U.S.C. § 2719(b)(1).[3] The hypothetical "opportunities for abuse" the majority fears are not based on the record here and do not provide a sufficient basis to strike down an act of Congress.

For all the reasons stated, the court is wrong in finding § 465 of the Indian Reorganization Act of 1934 an unconstitutional delegation of legislative authority. The district court should not be reversed on this basis. The Act was intended "to rehabilitate the Indian's economic life" and "to develop the initiative destroyed by a century of oppression and paternalism," *Mescalero*, 411 U.S. at 152, 93 S.Ct. at 1272, and the Congressional delegation of authority for that purpose is principled and proper.

### III.

The nonconstitutional issues on the appeal need to be addressed, and one of these re-

quires reversal. Plaintiffs claim under the APA that the Department failed to follow its own procedures when it reviewed and approved the Tribe's request to take land into trust,[4] that the Assistant Secretary acted beyond the scope of his delegated authority, and that the decision to take the land into trust was arbitrary, capricious and an abuse of discretion. The district court relied on the analysis in *State of Florida v. United States Department of the Interior*, 768 F.2d 1248 (11th Cir.1985), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986), to conclude that the Quiet Title Act (QTA), 28 U.S.C. § 2409a, precludes review in this case and that it therefore lacked jurisdiction. The QTA permits the United States to be sued to resolve real property disputes, but by its terms it does not apply to trust or restricted Indian lands. 28 U.S.C. § 2409a. For the reasons discussed below, I would reverse and remand for further proceedings.

The APA waives the sovereign immunity of the United States and federal officers for challenges to an agency action in which the relief sought is not money damages. 5 U.S.C. § 702. The broad waiver of immunity contains an exception, however:

> Nothing herein ... confers authority to grant relief if any other statute that grants

status, land may be acquired for an individual Indian in trust status

 1) when the land is located within the exterior boundaries of an Indian Reservation, or adjacent thereto; or,

 2) when the land is already in trust or restricted status.

The regulations also list specific factors to be considered when evaluating a request. These include the need for the individual Indian or the tribe for additional land, the purposes for which the land will be used, the impact on the state and its political subdivisions resulting from the removal of the land for the tax rolls, and jurisdictional problems and potential conflicts of land use which may arise. 25 C.F.R. § 151.10 (April 1995).

The Secretary promulgated new regulations on June 23, 1995 which require that state and local governments which are affected by a proposed acquisition be notified and given time to respond. 25 C.F.R. §§ 151.10, 151.11 (60 F.R. 32879, June 23, 1995). Although the old regulations do not set out such a notice requirement, it was apparently done in practice. The State and city in this case both were notified and responded. The 1995 regulations also provide several additional

factors to consider for off-reservation land acquisitions.

3. This statute also provides that nothing in the section limiting gaming on trust land "shall affect or diminish the authority and responsibility of the Secretary to take land into trust." 25 U.S.C. § 2719(c).

4. Plaintiffs assert that the Assistant Secretary for Indian Affairs failed to consider on the record the factors listed in 25 C.F.R. § 151.10. Specifically, they claim that the Assistant Secretary did not know the actual purposes for which the land would be used, did not explain the need of the Tribe for additional land, and did not consider the jurisdictional problems and potential conflicts of land use which might arise, or the effect of the removal of the land from the tax rolls. They also assert that the Assistant Secretary did not consider whether the acquisition was consistent with 25 C.F.R. § 151.3, which describes when land outside the reservation may be acquired, and did not follow procedures described in memoranda issued by the Secretary of the Interior.

consent to suit expressly or impliedly forbids the relief which is sought.

*Id.* The QTA, 28 U.S.C. § 2409a, is one such "other statute that grants consent to suit" referred to in the APA waiver provision. *Block v. North Dakota ex rel. Board of University and School Lands,* 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983). The QTA provides that:

> The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights.

28 U.S.C. § 2409a. It also provides that this section permitting suits against the United States "does not apply to trust or restricted Indian lands...." *Id.*

The QTA is the exclusive means by which an adverse claimant can assert a property interest against the United States. *Block,* 461 U.S. at 286, 103 S.Ct. at 1819; *Ducheneaux v. Secretary of the Interior,* 837 F.2d 340, 343 (8th Cir.), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2822, 100 L.Ed.2d 923 (1988). If such a claim is barred by the provisions of the QTA because it involves title to Indian trust lands or the statute of limitations has run, for example, it cannot be brought under another statute. *Block,* 461 U.S. at 286, 103 S.Ct. at 1819; *Ducheneaux,* 837 F.2d at 343 (application of the QTA "preempts" review under the APA). The waiver of immunity in the APA does not apply to such claims. *Id.*

The key point here is these plaintiffs do not assert a property interest in the land. Instead they seek judicial review of the agency action by which land was acquired. The QTA would not provide consent to suit for such a claim, even if Indian trust lands were not involved. The question then is to what extent the QTA provisions limit the scope of the waiver of immunity in the APA for claims to which the QTA itself does not apply.

It would distort the meaning of the QTA to interpret it as impliedly forbidding all suits seeking to divest the United States of title to Indian trust land, including those in which

judicial review of the agency decision to acquire trust lands is invoked. The QTA was enacted to allow adverse claimants to assert their interests in real property by suing the United States. Its provisions set out the requirements for a valid complaint of this type. The exception for Indian lands was included to avoid the possibility that such suits be used to "abridg[e] the historic relationship between the Federal Government and the Indians without the consent of the Indians." H.R.Rep. No. 1559, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 4547, 4556–57. The statutory language simply states that the section does not apply to such lands. To say that Congress intended by this to foreclose any type of claim which could result in divestment of title to Indian trust land would require an excessively broad reading of the statute's language and its purpose.

*State of Florida v. United States Department of the Interior,* relied on by the district court, held that a suit challenging the United State's title to Indian trust land was impliedly forbidden by the QTA, even though it was not technically a suit to quiet title. 768 F.2d at 1253–55. That conclusion was based on a finding there that the suit challenged the tribe's conduct on the land, rather than the Secretary's decision to acquire the land, and thus did not seek review of an agency action. *Id.* at 1251. The *Florida* plaintiffs did not intervene during the trust application process, but complained only after the tribe began selling cigarettes and operating a bingo facility on the land.

In contrast, plaintiffs here seek review of an agency action. They actively opposed the land being taken into trust throughout the Department's review of the Tribe's application, and their claims specifically challenge the decision to acquire the land and the process by which that decision was made. This case more closely resembles *City of Sault Ste. Marie v. Andrus,* 458 F.Supp. 465, 470–72 (D.D.C.1978), which held that the QTA did not preclude claims challenging the Department's decision to take land into trust.[5]

---

5. Plaintiffs in *Sault St. Marie* claimed that the tribe for which land was taken into trust was not

a tribe within the meaning of the Indian Reorganization Act.

The nature of the relief sought in a challenge to existing title differs from that sought in a request for review of an administrative decision to acquire title. This is true even though both could result in divestment of title to Indian trust land. The *Florida* decision rests on the fact that the complaints in that case arose only after the land was taken into trust. In such circumstances divestment could interfere with an existing trust relationship. Although the plaintiffs in this case similarly ask that the trust acquisition be set aside,[6] the complaint seeks review of decisions made before the trust relationship was established. Challenging the acquisition of title is less intrusive to a trust relationship than challenging the status of existing title.

In sum, the QTA does not prevent these plaintiffs from bringing an APA claim to challenge the Secretary's decision to take title to the land in trust for the Tribe, and the district court's dismissal of these claims should be reversed. In its motion for dismissal, the Department also raised the issue regarding the availability of judicial review which was not considered below. That issue should be resolved by the district court on remand.

For these reasons, I would reverse the judgment of dismissal and remand for further proceedings consistent with this opinion.

6. The timing of the actual taking of the land into trust does not affect the analysis in this case. The final decision to take the land was made on December 13, 1990, but because of problems with the title, the actual acquisition did not occur until November 30, 1992. When this action was filed on July 13, 1992, it technically did not seek to divest the United States of title, but to prevent it from completing the acquisition. If the QTA were interpreted to preclude all claims to divest after acquisition, jurisdiction could have been lost on November 30, or possibly earlier. Because the QTA does not affect claims seeking the type of judicial review sought here, however, the date of the acquisition does not appear to be of critical importance.