# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2309

_____

State of South Dakota; City of          *
Oacoma, South Dakota; Lyman County,     *
South Dakota,                           *
                                        *
              Plaintiffs/Appellants,    *
                                        *
     v.                                 *
                                        *
United States Department of the         *    Appeal from the United States
Interior; Aurene Martin, Acting         *    District Court for the
Assistant Secretary, Indian Affairs;    *    District of South Dakota.
Bill Benjamin, Acting Regional          *
Director, Great Plains Regional Office, *
BIA; Cleve Her Many Horses,             *
Superintendent, Lower Brule Agency,     *
BIA; James McDivitt, Deputy Assistant   *
Secretary, Indian Affairs,              *
                                        *
              Defendants/Appellees,     *
                                        *
Lower Brule Sioux Tribe,                *
                                        *
              Interested Party.         *

_____

Submitted: March 14, 2005
    Filed:  September 6, 2005

_____

Before WOLLMAN, LAY, and HANSEN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

The State of South Dakota, City of Oacoma, and Lyman County (collectively referred to as the State) appeal from the district court's[1] grant of summary judgment in favor of the Department of the Interior (the Department), upholding the Secretary of the Interior's[2] decision to use his authority based on section 5 of the Indian Reorganization Act (IRA), 25 U.S.C. § 465, to take certain land into trust for the Lower Brule Sioux Tribe. We affirm.

## I.

In 1990, the Lower Brule Sioux Tribe sought to have 91 acres of off-reservation land that it had purchased taken into trust. The land is located within the municipal limits of the city of Oacoma, some seven or eight miles south of the Tribe's reservation and adjacent to Interstate 90 near exit 260. The Department approved its request, and the Interior Board of Indian Appeals dismissed the resulting appeal. The State filed a claim in the district court, seeking review of the Secretary's action and contending that 25 U.S.C. § 465 was an unconstitutional delegation of legislative power. The district court concluded that the statute was constitutional, but held that it was without jurisdiction to review the remaining claims and dismissed the case. This court reversed, finding that § 465 constituted an unconstitutional delegation of legislative power. We concluded that the Department had interpreted its own power too broadly and was exercising that power in an unchecked manner because it had also interpreted the statute as delegating unreviewable discretionary authority to the Secretary. South Dakota v. United States Dep't of the Interior, 69 F.3d 878, 881-85 (8th Cir. 1995) (South Dakota I). The Department promulgated a new regulation that

_____

[1]The Honorable Richard H. Battey, United States District Judge for the District of South Dakota.

[2]The Secretary of the Interior at the time the land was taken into trust was Bruce Babbitt. The current Secretary is Gale A. Norton, who took office January 31, 2001.

provided for judicial review, 25 C.F.R. § 151.12(b), and then petitioned for writ of certiorari, asking that the United States Supreme Court vacate our decision and remand the case to the Department. The Supreme Court granted the writ and vacated the judgment, directing that the matter be remanded "to the Secretary of the Interior for reconsideration of his administrative decision," Dep't of the Interior v. South Dakota, 519 U.S. 919, 919-20 (1996) (South Dakota II), in light of the new regulation allowing for judicial review. Some seven months later, the Department removed the land from trust status.

In 1997, the Tribe submitted an amended application to the Secretary, requesting that the United States take the land into trust on the Tribe's behalf. The Tribe submitted a business plan describing its intent to use the land for a cultural center and tourist attraction that would draw tourists to further explore the South Dakota Native American Scenic Byway.[3] State's App. (App.) 82A-82C. The Bureau of Indian Affairs (BIA) gave notice to state, county, and city officials, requesting information and comments. The State responded by raising the following objections: the statute unconstitutionally delegated legislative authority; the Tribe had not shown its need for the land to be taken into trust; a significant loss in state revenue and numerous jurisdictional problems would result if the land were taken into trust; the distance between the land and the reservation counseled against the acquisition; and the land would likely be used for gaming purposes. The city and county separately objected by alleging that the taking of the land into trust could stifle the growth of the community and affect its income.

In its May 20, 1998, response to the objections, the Tribe asserted that it would benefit from having the land held in trust because of the resulting significant federal

---

[3]The Tribe also attached a comprehensive plan of the goals for the entire corridor of the Native American Scenic Byway that described everything from the vision for the byway to the management and marketing necessary to accomplish it. Supp. App. 112-275.

protections that would facilitate the growth of tribal industry and would assure the Tribe's future generations the continued use of the land. The Tribe also asserted that because the Tribe's planned use of the land would result in increased tourism, the local governments would suffer no significant revenue loss. The response confirmed that the Tribe's business plan detailed its specific intentions for the land and stated that the Tribe would not use the land for gaming.

The Secretary evaluated the application in accordance with the Department's regulations, basing his conclusion on the information provided by the parties involved and on internal recommendations from various levels within the Department. The Secretary concluded that it would be appropriate to take the land into trust and published notice in the Federal Register.

The State again filed suit in federal court to challenge the agency action.[4] The suit was delayed for the completion of an environmental assessment in accordance with the National Environmental Policy Act, after which the Secretary ratified his decision, finding that taking the land into trust would have no significant impact on the quality of the human environment. The State amended its complaint and filed a motion to supplement the administrative record to provide support for its claim that the Tribe in fact intended to use the land for gaming purposes. The district court denied the motion to supplement the record, finding that the record adequately reflected the facts and concluding that the plaintiffs had not shown bad faith or improper behavior sufficient to justify supplementation. The parties filed cross-motions for summary judgment. The district court granted the Department's motion, once again finding 25 U.S.C. § 465 to be constitutional and holding that the decision to grant trust status was not arbitrary or capricious. South Dakota v. United States

_____

[4]In July 2001, the Tribe moved to intervene in the State's suit. The district court denied the Tribe's motion for intervention as of right and for permissive intervention, and we affirmed. South Dakota v. United States Dep't of the Interior, 317 F.3d 783 (8th Cir. 2003).

-4-

Dep't of the Interior, 314 F. Supp. 2d 935 (D.S.D. 2004) (South Dakota III). It concluded that the "Secretary's decision satisfactorily addressed all relevant criteria" in its regulations. Id. at 948.

## II.

We review *de novo* the district court's grant or denial of a motion for summary judgment. Children's Healthcare Is a Legal Duty, Inc. v. De Parle, 212 F.3d 1084, 1090 (8th Cir. 2000). Viewing the record in the light most favorable to the nonmoving party, we ask whether a genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. Id. We also review *de novo* questions of constitutional law. Coalition for Fair & Equitable Regulation of Docks v. Fed. Energy Regulatory Comm'n, 297 F.3d 771, 778 (8th Cir. 2002).

## A.

The State first claims that because 25 U.S.C. § 465 does not delineate any boundaries governing the executive's decision to acquire land in trust for Indians, it constitutes an unlawful delegation of legislative power in violation of Article 1, Section 1, of the Constitution ("All legislative Powers herein granted shall be vested in a Congress of the United States."). Congress may delegate its legislative power if it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 409 (1928). The Supreme Court has given Congress wide latitude in meeting the intelligible principle requirement, recognizing that "Congress simply cannot do its job absent an ability to delegate power under broad general directives." Mistretta v. United States, 488 U.S. 361, 372 (1989).

The Supreme Court has struck down statutes on delegation grounds on only two occasions. Panama Refining Co. v. Ryan, 293 U.S. 388 (1935); A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935). The statutes at issue in those cases were promulgated in a unique political climate and delegated to the President

exceptionally broad control over the national economy. Section 9(c) of the National Industrial Recovery Act, invalidated in Panama Refining, gave the President blanket authority to prohibit transportation of petroleum; neither its language nor its context provided any criteria to guide the President or required any specific findings before he acted. 293 U.S. at 415-16. Section 3 of the National Industrial Recovery Act, struck down in Schechter Poultry, authorized the President to prescribe and approve mandatory "codes of fair competition" for various industries without additional congressional approval. 295 U.S. at 521-23. The Court warned that "Congress cannot delegate legislative power to the President to exercise an unfettered discretion to make whatever laws he thinks may be needed or advisable for the rehabilitation and expansion of trade or industry." Id. at 537-38.

Since 1935, however, the Court has given "narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional." Mistretta, 488 U.S. at 373 n.7. The Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." Whitman v. Am. Trucking Ass'ns Inc., 531 U.S. 457, 474-75 (2001) (quotation omitted). The Court has made such narrow constructions by rejecting overly broad interpretations of certain words and giving the words content "by their surroundings." Id. at 466. The Court has found an intelligible principle, although admittedly broad, even when an act simply stated that an agency should promulgate regulations encouraging the effective use of radio in the "public interest, convenience, or necessity," noting that the meaning of "public interest" was limited in light of the larger aim of the Act. Nat'l Broad. Co. v. United States, 319 U.S. 190, 215-17 (1943). Broad phrases of purpose in an act are not "utterly without meaning" when viewed in the light of "the purpose of the Act, its factual background and the statutory context in which [the phrases of purpose] appear." Am. Power & Light Co. v. Securities & Exch. Comm'n, 329 U.S. 90, 104 (1946).

Congress fails to give sufficient guidance in its delegations only if it "would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." Yakus v. United States, 321 U.S. 414, 426 (1944). Its will is sufficiently articulated "if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." Am. Power, 329 U.S. at 105. The statute does not have to provide a "determinate criterion" for the exercise of the delegated power, as long as a policy is articulated. Whitman, 531 U.S. at 475.

The IRA's delegation of authority is set forth as follows:

> The Secretary of the Interior is hereby authorized, in his discretion, to acquire through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments whether the allottee be living or deceased, for the purpose of providing land for Indians.

25 U.S.C. § 465. Section 465 also authorizes the allocation of up to two million dollars each fiscal year for that purpose. Id. The State argues that § 465 provides no practical boundaries to the Secretary's authority and that the statute's purposes are so broad that they could be construed to justify almost any land acquisition.

As indicated above, we previously found § 465 to be unconstitutional, South Dakota I, 69 F.3d 878, concluding that the statutory language contained "no perceptible 'boundaries,' no 'intelligible principles,'" id. at 882, a fact that, together with the broad agency interpretation, created "an agency fiefdom whose boundaries were never established by Congress, and whose exercise of unrestrained power is free of judicial review." Id. at 885. Judge Murphy dissented, stating that the court had unnecessarily reached the constitutional issue instead of reaching the merits of the State's Administrative Procedure Act (APA) claim. Id. at 885. She also concluded

that the statute contained boundaries sufficient to bring it within the broad range of acceptable delegations because the statute was confined in scope, its text, when viewed in its historical context, limited the Secretary's discretion, and its legislative history revealed its purposes.  Id. at 887.

Because the Supreme Court vacated our 1995 opinion, we are not bound by its conclusion.[5]  Accordingly, we reexamine the broader context of the Act to determine whether the delegation in 25 U.S.C. § 465 includes guidance sufficient to withstand a challenge based upon nondelegation doctrine grounds.  We may look solely to the language and the context of the statute in determining its constitutionality and may not consider any particular agency interpretation as determinative in our constitutional inquiry.[6]  See Whitman, 531 U.S. at 472 (stating that "[w]e have never suggested that an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute").  Whether the agency is reasonably applying its delegated power is an inquiry distinct from the question

---

[5]The Supreme Court issued what is known as a GVR (granting certiorari, vacating the judgment below, and remanding the case with minimal direction).  A GVR does not compel a particular determination or outcome, but occurs often when an intervening development may affect the outcome of the case.  See, e.g., Jackson v. United States, 125 S. Ct. 1019 (2005) (issuing a GVR "for further consideration in light of United States v. Booker, 125 S. Ct. 738 (2005)"); Consolidated Foods Corp. v. Unger, 456 U.S. 1002 (1982) ("for further consideration in light of Kremer v. Chemical Constr. Corp., 456 U.S. 461 (1982)").  Cf. Republican Party of Minnesota v. White, No. 99-4021, slip op. at 7-8 (8th Cir. Aug. 2, 2005) (en banc).

[6]This principle had not been clearly articulated in the past, as evidenced by our prior opinion and the Department's argument in its petition for certiorari in this case. The Department asked the Supreme Court to vacate and remand the case because our prior opinion was based in part on the lack of judicial review available under the Department's regulations and the fact that the Department had since issued new regulations acknowledging the availability of judicial review.  The Department contended that the challenge should be revisited in light of the new regulation.

whether the delegation contains sufficient guidance to pass constitutional muster. We will, if possible, give "narrow constructions to statutory delegations," Mistretta, 488 U.S. at 373 n.7, and then proceed to evaluate the agency action under the APA.

We conclude that the purposes evident in the whole of the IRA and its legislative history sufficiently narrow the delegation and guide the Secretary's discretion in deciding when to take land into trust. The IRA, 25 U.S.C. §§ 461-479, enacted in 1934, "reflected a new policy of the Federal Government and aimed to put a halt to the loss of tribal lands through allotment. It gave the Secretary of the Interior power to create new reservations, and tribes were encouraged to revitalize their self-government . . . ." Mescalero Apache Tribe v. Jones, 411 U.S. 145, 151 (1973); see also Chase v. McMasters, 573 F.2d 1011, 1016 (8th Cir. 1978) (highlighting that the various sections of the act all reflected the purpose of ensuring protection of Indian lands).

The Tenth and the First Circuits have both found that § 465 does not violate the nondelegation doctrine. United States v. Roberts, 185 F.3d 1125 (10th Cir. 1999); Carcieri v. Norton, 398 F.3d 22 (1st Cir. 2005). In Roberts, the Tenth Circuit cited Judge Murphy's dissent and concluded that the statute places adequate limits on the Secretary's discretion, namely, the requirement that the land be acquired for Indians, the limitation on authorized funds, and the goals identified in the legislative history. 185 F.3d at 1137; see also Carcieri, 398 F.3d at 33-34 (adopting the Roberts court's reasoning).

We agree with the views expressed by Judge Murphy in her dissent in South Dakota I: The scope of the power conferred in § 465 is broad, but—unlike the powers conferred in Panama Refining and Schechter Poultry—it does not involve granting to the executive authority to unilaterally enact a sweeping regulatory scheme that will affect the entire national economy. We believe that it is possible to "ascertain whether the will of Congress has been obeyed" when examining an

application of the Secretary's authority under § 465 based upon the guidance in the IRA and its legislative history.  See Yakus, 321 U.S. at 426.

The language of § 465 itself provides guidance.  As Judge Murphy stated:

> It directs that any land acquired must be for Indians as they are defined in 25 U.S.C. § 479.  It authorizes the appropriation of a limited amount of funds with which land could be acquired and specifically prohibits use of such funds to acquire land for the Navajo Indians outside of their established reservation boundaries in Arizona and New Mexico.

South Dakota I, 69 F.3d at 887 (Murphy, J., dissenting).  The State argues that these claimed textual limitations are artificial because any acquisition could be seen as "for Indians," regardless of who else it harms.  Likewise, because most of the land currently taken into trust has been previously purchased by a tribe, the limit on appropriated funds for purchasing land is irrelevant.  We disagree that these limitations were meaningless when the IRA was enacted,  and we conclude that the context of the entire act and its legislative history continue to give meaning to the phrase "for the purpose of providing land for Indians."

The legislative history of the IRA indicates that "[t]he intent and purpose of the Reorganization Act was 'to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism.'"  Mescalero Apache Tribe, 411 U.S. at 152 (quoting H.R. Rep. No. 1804, 73rd Cong., 2d Sess., at 6 (1934)).  Numerous sections in the act itself and in its legislative history indicate that Congress believed that a critical aspect of that broad goal was "to conserve and develop Indian lands and resources." H.R. Rep. No. 1804, 73rd Cong., 2d Sess., at 5 (1934) (the first phrase included in the title of the bill); S. Rep. No. 1080, 73rd Cong., 2d Sess., at 1 (1934) (same).  The act includes six sections addressed to land policy.  25 U.S.C. §§ 461-466 (providing means to preserve and increase the amount of Indian lands).  Representative Howard, the

-10-

sponsor of the bill in the House of Representatives, described the tremendous loss of land that resulted from the government's allotment policy, begun in 1887, 78 Cong. Rec. 11,726 (1934), and indicated that the act would help remedy the problem by preventing "any further loss of Indian lands" and permitting "the purchase of additional lands for landless Indians." Id. at 11,727; see also 78 Cong. Rec. 11,123 (June 12, 1934) (statement of Senator Wheeler, sponsor of the bill in the Senate, echoing the remedial goals in relation to Indian lands).

Congress believed that additional land was essential for the economic advancement and self-support of the Indian communities. S. Rep. No. 1080, at 2 (stating that section 5 would "meet the needs of landless Indians and of Indian individuals and tribes whose land holdings are insufficient for self-support"); H.R. Rep. No. 1804, at 6 (noting that the purchase of lands would help "[t]o make many of the now pauperized, landless Indians self-supporting"); 78 Cong. Rec. 11,730 (statement of Rep. Howard that section 5 would "provide land for Indians who have no land or insufficient land, and who can use land beneficially"). Although the legislative history frequently mentions landless Indians, we do not believe that Congress intended to limit its broadly stated purposes of economic advancement and additional lands for Indians to situations involving landless Indians. The House and Senate reports imply that members of Congress believed that that would be the most common application of the statute—giving land to landless Indians would enable them to farm or work in stock grazing or forestry operations—but the statutory language and the expressions of purpose for section 5 in the reports indicate that Congress placed primary emphasis on the needs of individuals and tribes for land and the likelihood that the land would be beneficially used to increase Indian self-support. See, e.g., S. Rep. No. 1080, at 2; 78 Cong. Rec. 11,732 (statement of Rep. Howard

that a long-term goal is "to build up Indian land holdings until there is sufficient land for all Indians who will beneficially use it").[7]

Accordingly, we conclude that an intelligible principle exists in the statutory phrase "for the purpose of providing land for Indians" when it is viewed in the statutory and historical context of the IRA. The statutory aims of providing lands sufficient to enable Indians to achieve self-support and ameliorating the damage resulting from the prior allotment policy sufficiently narrow the discretionary authority granted to the Department. We therefore affirm the grant of summary judgment for the Department on the nondelegation doctrine challenge.

**B.**

We turn, then, to a review of the Secretary's action approving the taking of the 91 acres into trust. We review the agency action under the APA. 5 U.S.C. §§ 701-706.[8] "When reviewing the district court's opinion upholding the administrative agency's decision, this court must render an independent decision on the basis of the same administrative record as that before the district court." United States v. Massey, 380 F.3d 437, 440 (8th Cir. 2004). We will set aside the agency action if the Secretary acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When we apply an agency regulation, "we accord substantial deference to an agency's interpretation of its own regulation," unless the regulation violates the Constitution or a federal statute,

---

[7]We have also previously concluded that the language and legislative history did not limit the application of § 465 to landless Indians. Chase, 573 F.2d at 1015-16.

[8]Such review of agency action is appropriate in most circumstances, absent the applicability of two narrow exceptions: where there is a statutory prohibition on review or where agency action is committed to agency discretion by law. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971); 5 U.S.C. § 701. Neither of these exceptions applies here.

"or unless the interpretation is 'plainly erroneous or inconsistent with the regulation.'" Coalition for Fair & Equitable Reg., 297 F.3d at 778.

As the reviewing court, we engage in a substantial inquiry, based on an examination of the administrative record, in order to answer three questions: (1) whether the Secretary acted within the scope of his authority, Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971); (2) whether the decision was "based on a consideration of the relevant factors," id. at 416; and (3) whether the Secretary "follow[ed] the necessary procedural requirements." Id. at 417. Here, the Secretary acted within the scope of his authority, for, as quoted above, § 465 specifically authorizes the Secretary to take land into trust for Indians. The more relevant questions on review are whether he considered the relevant factors and followed the necessary procedural requirements.

We are to make a searching inquiry into the facts, examining the full administrative record, 5 U.S.C. § 706, but we do not substitute our judgment for that of the agency, South Dakota v. Ubbelohde, 330 F.3d 1014, 1031 (8th Cir. 2003), even if the evidence would have also supported the opposite conclusion. Harrod v. Glickman, 206 F.3d 783, 789 (8th Cir. 2000). We ask whether the agency "'articulate[d] a rational connection between the facts found and the choice made.'" Ubbelohde, 330 F.3d at 1031 (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 288 (1974)); see also Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48 (1983) (stating that "an agency must cogently explain why it has exercised its discretion in a given manner"). We will not try to identify failures in clarity or detail, State Farm, 463 U.S. at 43, and will reverse "only when there is no rational basis for the policy choice." Ubbelohde, 330 F.3d at 1032. In other words, the agency need not exhaustively analyze every factor, but must base its determination "upon factors listed in the appropriate regulations" and must use a "reasonable interpretation of the regulation and the statute" in reaching its conclusion. Harrod, 206 F.3d at 788. The

-13-

burden is on the plaintiff to prove that the agency's action was arbitrary and capricious. Massey, 380 F.3d at 440.

The State challenges the adequacy of the Department's consideration of several of the required factors. In order to meet its burden of proof, however, it must present evidence that the agency did not consider a particular factor; it may not simply point to the end result and argue generally that it is incorrect. The regulations established by the Department to implement the IRA are binding, and they establish the process that the Secretary must follow in deciding whether to take land into trust, 25 C.F.R. §§ 151.10 and 151.11, thereby guiding our inquiry.

For an off-reservation acquisition, described in 25 C.F.R. § 151.11, the Secretary must consider all but one of the factors in 25 C.F.R. § 151.10 (considerations for on-reservation acquisitions) plus three additional considerations. The State claims that the following criteria in § 151.10 were not properly considered:

> (b) The need of the individual Indian or the tribe for additional land;
> (c) The purposes for which the land will be used;
> . . .
> (e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;
> (f) Jurisdictional problems and potential conflicts of land use which may arise.

The State also argues that § 151.11(b) was not adequately analyzed. This provision states:

> (b) The location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation, shall be considered as follows: as the distance between the tribe's reservation and the land to

be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition. . . .

The record reveals that the Department extensively reviewed the Tribe's application and the objections raised in the State's response. In light of the complex history of the case, the Secretary's final decision was issued by the Assistant Secretary of Indian Affairs rather than by the BIA's Regional Director. The Regional Director had recommended final approval, stating that the Tribe would greatly benefit economically and setting forth a brief review of each of the relevant provisions in 25 C.F.R. §§ 151.10 and 151.11. App. 227-33. The Acting Deputy Commissioner of Indian Affairs noted several deficiencies in the application and asked the Regional Director for a more detailed analysis of several factors. Id. at 234-35. The Regional Director submitted another memorandum and reconfirmed her recommendation. Id. at 236-39. The Director of the Office of Trust Responsibilities, through the Deputy Commissioner of Indian Affairs, then provided a memorandum in support of the Assistant Secretary's decision to take the land into trust that included a detailed analysis of the factors in the regulations. Id. at 242-48.

We conclude that the Secretary reasonably and appropriately evaluated the relevant factors. The agency "articulate[d] a rational connection between the facts found and the choice made," Ubbelohde, 330 F.3d at 1031 (quotation omitted), for each of the regulatory provisions, and we do not require precise explanations that respond to every contention. The record supports the conclusion that the expressed rationale in the Secretary's conclusions was consistent with the facts.

In analyzing the Tribe's need for the additional land, 25 C.F.R. § 151.10(b), the Regional Director expressed her belief that the particular tract of land would greatly enhance the Tribe's economic base and its ability to be self-sufficient, thereby serving the purposes of the IRA. App. 236-37. The memorandum accompanying the final decision also emphasized that the Tribe had great need for additional income and

stated that "[t]he location of the land, adjacent to Interstate No. 90, makes it more attractive to business and would enhance the tribes [sic] economic rehabilitation and support self sufficiency." Id. at 245. The Tribe asserted that the protections of trust status were essential to facilitate growth in tribal industry and ensure the use of the land for future generations. Id. at 192. We agree with the district court that it would be an unreasonable interpretation of 25 C.F.R. § 151.10(b) to require the Secretary to detail specifically why trust status is more beneficial than fee status in the particular circumstance. South Dakota III, 314 F. Supp. 2d at 943. It was sufficient for the Department's analysis to express the Tribe's needs and conclude generally that IRA purposes were served. Its conclusion that the Tribe needed the land to be taken into trust was therefore reasonable.

The Tribe made its purpose for the land clear through its business plan and the comprehensive plan for the entire corridor of the Native American Scenic Byway. It expressed its intent to establish a means of attracting heritage tourism to its reservation by building an information center and southern terminal entrance to the Native American Scenic Byway on the 91-acre parcel. App. 82C. The business plan described a display that would include a "circle of teepees" to represent the seven Sioux tribes located within South Dakota and that would attract visitors to the historical byway. Id. It was reasonable for the Secretary to accept the Tribe's representations in his analysis of 25 C.F.R. § 151.10(c). Id. at 246. In addition, the Secretary was not required to seek out further evidence of possible gaming purposes in light of the Tribe's repeated assurances that it did not intend to use the land for gaming[9] and the December 15, 1998, letter from then-Governor Janklow that expressed his support for the acquisition and which stated that he had been assured "that the Tribe [would] not conduct gaming" on the land. Id. at 204.

---

[9]The Tribe also acknowledged that if it were later to seek to allow gaming on the land, it would fully comply with the additional application and approval requirements in the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-2721. App. 197-98.

Because the Tribe owned the land in unrestricted fee status prior to its application for trust status, the Secretary also evaluated the impact of the loss of taxes on the State in accordance with 25 C.F.R. § 151.10(e). The Secretary found that the county and city would lose $2,587.02 in taxes, and expressed his belief that the amount was insignificant in light of the great benefit to the Tribe.[10] Id. at 238, 246-47. The State argues that its potential loss would be much higher if the land, which currently houses no businesses, were developed, and contends that the Secretary should have to consider such potential loss. We disagree, and we adopt the district court's reasoning that it is a reasonable interpretation of the regulation to require consideration of the tax impact only in relation to the manner in which the land was being used at the time of the application. South Dakota III, 314 F. Supp. 2d at 945.

It was also appropriate for the Secretary to conclude that no serious jurisdictional problems were likely to result from taking the land into trust. The Secretary appropriately considered the availability of law enforcement services, noting that the BIA would provide such services, as it does within the Lower Brule Reservation, and indicating that the Tribe had expressed its intent to pay for any additional services received from the City of Oacoma. App. 238, 247. Moreover, we cannot say that it was inappropriate for the Secretary to take into account the fact that apparently no jurisdictional problems had resulted from the Tribe's acquisition in 1995 of some 3,400 acres of land lying west of the Lower Brule Reservation. Id. at 247.

---

[10]The Tribe additionally asserted that it expected its plan to increase tourism in the area and therefore believed that the city's businesses would benefit from the increased traffic, offsetting "any loss in property taxes" resulting from the land being taken into trust. App. 241.

Finally, although the memoranda did not specifically mention 25 C.F.R. § 151.11(b), the provision concerning the location of the acquired land in relation to state and tribal boundaries, we cannot say that the Secretary failed to consider it. The distance between the reservation and the 91 acres is not so great as to make the land's connection to the reservation illogical or to require more exacting scrutiny of the Tribe's intent. As indicated earlier, the property is located some seven to eight miles south of the Tribe's reservation. That distance, considering the circumstances of rural central South Dakota, is of no great significance, and the tract's location in close proximity to Interstate 90, the major east-west route across the state, holds the greatest potential for the accomplishment of the Tribe's goals. The Secretary acknowledged the distance of the land from the exterior boundaries of the reservation, and his discussion of the location of the property reflected his adequate consideration of § 151.11(b).

Accordingly, we conclude that the Secretary's action was not arbitrary, capricious, or an abuse of discretion, and we affirm the grant of summary judgment in favor of the Department.

**III.**

In addition to claiming that the Secretary acted arbitrarily, the State also raises a separate claim that the district court erred in not allowing supplementation of the record with evidence that the Tribe's actual intended use for the property is that of conducting gaming operations. We will defer to the district court's conclusion that the administrative record contained sufficient information "absent a gross abuse of discretion." Voyageurs Nat'l Park Ass'n v. Norton, 381 F.3d 759, 766 (8th Cir. 2004). The State argues that the district court could not determine whether the agency properly analyzed the factors without examining the State's proffered additional evidence. "A federal court is confined to the administrative record in deciding an appeal under the APA," Maxey v. Kadrovach, 890 F.2d 73, 77 (8th Cir. 1989); see also Newton County Wildlife Assoc. v. Rogers, 141 F.3d 803, 807 (8th

Cir. 1998), in order to "preclude[] the reviewing court from conducting a de novo trial and substituting its opinion for that of the agency." Voyageurs, 381 F.3d at 766. The very narrow exceptions to this rule "apply only under extraordinary circumstances" in which a strong showing can be made that the record is so incomplete as to preclude effective judicial review or that there is clear bad faith or improper behavior. Id. No such extraordinary circumstances are present here.

The State has failed to show that the Secretary's actions evidenced bad faith sufficient to justify the supplementation. If there is any evidence of bad faith at all, it "falls short of the strong showing of bad faith or improper behavior necessary to permit discovery and supplementation of the administrative record." Maxey, 890 F.2d at 77. In his September 25, 1997, letter to the BIA, the Tribal Chairman stated that it was not the Tribe's current intention to use the land for gaming. The letter further stated that if gaming was eventually considered, "our Council has passed a resolution indicating that we would adhere to the provisions of the Indian Gaming Regulatory Act (IGRA)."[11] App. 82. As indicated above, the Tribe's December 1997 business plan for the land more specifically detailed its purposes and intended use for the land. Likewise, in its May 20, 1998, response to the State's objections, the Tribe reasserted its commitment not to use the land for gaming, again noting that IGRA ensured that it could not change its mind without additional state and federal approval. Id. at 197.

We conclude that the district court did not err in finding that the Tribe's consistent representations that it did not intend to use the land for gaming constituted

---

[11]IGRA establishes that a tribe must meet additional requirements before it may use off-reservation land for gaming purposes. 25 U.S.C. § 2719. Even if the tribe obtained the land in trust for a non-gaming purpose and then changed its mind, it would still have to comply with the requirements detailed in IGRA before it could do so. Id.; see also 64 Fed. Reg. 17,578 (Apr. 12, 1999).

sufficient evidence to support the Secretary's conclusion in that regard and that there was thus no need to supplement the record.

The judgment is affirmed.

_____