# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1150

_____

State of South Dakota; Moody     *
County, South Dakota,     *
    *
          Appellants,     *
    *    Appeal from the United States
      v.     *    District Court for the
    *    District of South Dakota
United States Department of Interior;     *
David W. Anderson, Assistant     *
Secretary–Indian Affairs; Regional     *
Director, Great Plains Regional     *
Office, BIA,     *
    *
          Appellees.     *

_____

Submitted: October 18, 2006
Filed: June 1, 2007

_____

Before SMITH, BOWMAN, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

The State of South Dakota ("the State") and Moody County ("the County") appeal from the district court's[1] grant of summary judgment in favor of the United States Department of the Interior ("the Department"), upholding the Department's

---

[1]The Honorable Karen E. Schrier, Chief Judge, United States District Court for the District of South Dakota.

decision to take land into trust for the Flandreau Santee Sioux Tribe ("FSST"). We affirm.

## I. *Background*

After purchasing 310 acres contiguous to its current reservation, the FSST submitted an application to the Bureau of Indian Affairs (BIA), requesting that the United States take the land into trust for the FSST's benefit pursuant to § 5 of the Indian Reorganization Act (IRA). In its application, the FSST stated that while it had "grown dramatically over the last thirty years in the area of membership, population, governmental services and infrastructure, economic infrastructure, and in the area of economic self-sufficiency," the FSST's trust land base "had not increased to meet [its] growing needs." Therefore, it asked the BIA to take the land into trust for "the Tribe's continued overall growth and development."

According to the FSST, one of the "top priorities" of its Executive Committee was to acquire additional lands for the tribe with the goal of

> expanding the Tribe's land base for the economic well being of the future generation of tribal members. While the Tribe currently realizes strong economic prosperity due to its success with its gaming operations, the Executive Committee acknowledged that they [sic] type of success realized through gaming may be temporary, and that gaming revenues . . . should be used to promote and ensure economic self-sufficiency and security for the future of the Tribe and its membership.

The FSST needed the land placed in trust "for future housing development to meet the needs of the ever-growing tribal population."[2]

_____

[2]At the time of its application, the FSST had 2100 acres of land in trust, all of which was located in Moody County. It had 695 members, approximately 225 of whom were adult members living in Moody County. Between 1990 and 2000, the FSST's membership increased by 155 members. Because of the employment

The FSST identified two potential uses for the land acquisition: (1) future housing development and (2) agriculture. First, FSST contemplated "expanding homesite leases for members wishing to utilize land for economic reasons." Numerous tribal members had requested that the FSST expand leases to develop individual economic opportunities, such as farming. Second, the FSST anticipated leasing some land for agriculture. Income generated from the leasing of the land would "provide additional revenues for general tribal government operations" and "help support programs such as the Tribe's natural resources department . . . ." "Most importantly, if the Tribe determines that the best use for this land should continue to be agricultural leasing, then the Tribe will be guaranteed an additional source of income for the future generation."

The Regional Director of the BIA ("Director") reviewed the FSST's application, seeking comments from both the State and the County. Specifically, the Director sought information regarding zoning and the potential impact of lost tax revenue. In response, the State and the County objected to the trust acquisition on numerous grounds. After obtaining responses to these objections from the FSST, the Director ultimately issued a letter granting the FSST's application to hold the land in trust. The State and the County subsequently appealed the decision to the Interior Board of Indian Appeals (IBIA), and the IBIA affirmed the Director's decision to grant the application.

The State and the County filed suit in federal district court, seeking a declaratory judgment that the Director's decision to grant the FSST's application was erroneous. Additionally, they sought an injunction to prevent the Department from acquiring the land in trust for the FSST. The district court granted summary judgment to the Department.

---

opportunities provided by the FSST's successful gaming operation, the number of tribal members returning to the FSST reservation doubled between 1990 and 2000.

## II. *Discussion*

On appeal, the State and the County make three arguments. The State and County aver that: (1) § 5 of the Indian Reorganization Act (IRA), 25 U.S.C. § 465, is an unlawful delegation of power to the Department in violation of Article 1, Section 1, of the Constitution; (2) the Department acted outside of its statutory authority when it acquired the land at issue, as trust acquisition did not fit the requisite economic criteria; and (3) the land at issue does not constitute "Indian Country."

## A. *Delegation*

The State and the County first ask us to reconsider our decision in *State of South Dakota v. United States Department of the Interior*, 423 F.3d 790 (8th Cir. 2005), in which a panel of this court held that § 5 of the IRA, 25 U.S.C. § 465, does not violate the nondelegation doctrine. We, however, may not overrule another panel's decision. *United States v. Prior*, 107 F.3d 654, 660 (8th Cir. 1997). Therefore, we affirm the district court's judgment that § 5 of the IRA is constitutional.

## B. *Statutory Authority*

"When reviewing the district court's opinion upholding the administrative agency's decision, this court must render an independent decision on the basis of the same administrative record as that before the district court." *South Dakota*, 423 F.3d at 799 (internal quotations and citation omitted). If the Secretary of the Interior acted arbitrarily or capriciously, abused his discretion, or otherwise failed to act in accordance with the law, we will set aside the agency action. *Id.* (citing 5 U.S.C. § 706(2)(A)). When applying an agency regulation, "we accord substantial deference to an agency's interpretation of its own regulation, unless the regulation violates the Constitution or a federal statute, or unless the interpretation is plainly erroneous or inconsistent with the regulation." *Id.* (internal quotations and citation omitted).

Thus, our task is to determine, based on our examination of the administrative record, "(1) whether the Secretary [of the Interior] acted within the scope of his authority; (2) whether the decision was based on a consideration of the relevant factors; and (3) whether the Secretary followed the necessary procedural requirements." *Id*. (internal quotations and citations omitted). Here, only the second inquiry is at issue, as the State alleges that, under the factors enumerated in 25 C.F.R. § 151.10, the Secretary lacks statutory authority for acquiring the land in trust.

Therefore, our focus is whether the Secretary considered the relevant factors in granting the FSST's application to take the acquired land into trust. For the acquisition of off-reservation land, described in 25 C.F.R. § 151.11, "the Secretary must consider all but one of the factors in 25 C.F.R. § 151.10 (considerations for on-reservation acquisitions) plus three additional considerations." *South Dakota*, 423 F.3d at 800. Most pertinent to this case, § 151.10 requires the Secretary to consider: "(a) [t]he existence of statutory authority for the acquisition and any limitations contained in such authority; (b) [t]he need of the individual Indian or the tribe for additional land; [and] (c) [t]he purposes for which the land will be used . . . ."

The State and the County argue that the Secretary lacked statutory authority to acquire the land at issue. Relying on our holding in *South Dakota*, they note that the Secretary's discretion to acquire trust land "for the purpose of providing land for Indians" is limited by the requirement that the land be acquired for self-support and to ameliorate the damage of prior allotment policies. They assert that the district court erred by not considering their argument that economic factors precluded the grant of trust status. Furthermore, they claim that, even if the district court had considered economic criteria, it would have found that the trust acquisition for the FSST did not meet such criteria because the FSST is a "well-to-do" tribe and because the FSST "essentially told the BIA that it would not make an economic argument to justify the acquisition."

In upholding § 5 of the IRA as a constitutional delegation of power in *South Dakota*, we noted that Congress's purpose in enacting the IRA was "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." 423 F.3d at 798 (internal quotations and citation omitted). Its broad goal was "to conserve and develop Indian lands and resources." *Id.* (internal quotations and citation omitted). "Congress believed that additional land was essential for the economic advancement and self-support of the Indian communities." *Id.* And, although the legislative history of the IRA frequently refers to "landless Indians," Congress's "broadly stated purposes of economic advancement and additional lands for Indians" are not limited to only landless Indians. *Id.* Congress "placed primary emphasis [in § 5] on the needs of individuals and tribes for land and the likelihood that the land would be beneficially used to increase Indian self-support." *Id.* Based on this congressional intent, we concluded that "[t]he statutory aims of providing lands sufficient to enable Indians to achieve self-support and ameliorating the damage resulting from the prior allotment policy sufficiently narrow the discretionary authority granted to the Department" to provide land for Indians. *Id.* at 799.

After reviewing the administrative record, we conclude that the Secretary acted within his statutory authority in acquiring the land in trust for the FSST. Specifically, we hold that the Director's report sufficiently outlined the self-support and economic benefits that the FSST would gain from the acquisition. The report's analysis is consistent with the IRA's purpose of promoting economic advancement and self-support for Indian tribes; therefore, the Director's report demonstrates that the Secretary acted within his statutory authority, as it was limited in *South Dakota*. First, the Director's report focused primarily on the FSST's need for additional land due to increased tribal membership. Taking additional land into trust to accommodate increased tribal membership is consistent with the statutory aim of enabling Indians

to achieve self-support.[3] Second, the Director's report mentioned the economic benefit that the FSST would derive from the acquisition, stating:

> With this land set aside for agricultural uses and possible future needs, the Tribe has the opportunity to utilize any of their existing land for other cultural, governmental or social needs of the Tribe instead of reserving their existing land for housing purposes which they know they will need in the future. The income provided from the leasing of this property will be used to support the Tribe's Natural Resource Program, the purpose of which is to manage all of the Tribe's landbase and ensure that tribal, state and federal environmental concerns are met.

With regard to the purpose for which the FSST will use the land, the Director focused almost exclusively on the economic benefit that the FSST would gain, explaining:

> This land will be used as agricultural land and will become part of the Tribe's Leasing Program which is administered by the Tribe's Department of Natural Resources. *This property, while being leased, will provide approximately $27,500.00 per year of income.* Along with the other tribal lands leased, approximately $100,000.00 will be received each year to supplement the Tribe's Department of Natural Resources. This agency of the Tribe provides, through Self-Determination, enforcement of tribal, state, and federal environmental requirements over

___

[3]In holding that the Secretary acted within his discretion in acquiring the land in trust for the FSST, we necessarily reject the State and the County's assertion that the FSST does not need the land for "self-support" because it already owns the land. In *South Dakota*, we recognized that "most of the land currently taken into trust has been previously purchased by a tribe. . . ." 423 F.3d at 798. We concluded that "it would be an unreasonable interpretation of 25 C.F.R. § 151.10(b) to require the Secretary to detail specifically why trust status is more beneficial than fee status in the particular circumstance." *Id*. at 801. Instead, it is sufficient for the Secretary to "express the Tribe's needs and conclude generally that the IRA purposes were served." *Id*.

all tribal trust lands and manages all of the Tribe's land base. Should the need arise in the future, the property may be set aside to provide housing sites for Tribal members.

(Emphasis added).

Therefore, we hold that the Secretary possessed the statutory authority to acquire the land in trust for the FSST and acted within his discretion in acquiring the land in trust.

### C. *Jurisdictional Problems and Potential Conflicts of Land*

The State and the County's final argument on appeal is that the district court erroneously determined that the land at issue constituted "Indian country." According to the State and the County, the district court premised its decision upon a finding that all land taken into trust off reservation, including the land at issue in this case, constitutes "Indian country." They assert that the district court used this erroneous finding to justify its determination that the Secretary adequately considered the factors under 25 C.F.R. § 151.10(f), which require the Secretary to consider potential jurisdictional and land use problems.

We need not reach the issue of whether the district court erroneously found that the land at issue in this case constitutes "Indian country" because we conclude that the Secretary adequately "considered" potential jurisdictional and land use problems in deciding to take land into trust for the FSST. Section 151.10(f) requires the Secretary to "consider" "[j]urisdictional problems and potential conflicts of land use which may arise" in "evaluating requests for the acquisition of land in trust status when the land is located within or contiguous to an Indian reservation." Here, the Secretary adequately "considered" such problems, concluding:

> Once this land is in trust status there will be no obvious jurisdictional problems which may arise. This land is adjacent to the existing

reservation and will be under the Tribe's civil, regulatory and criminal jurisdiction as the Tribe plans to have this land proclaimed to be a part of their reservation. Once the property is placed in trust status, the Tribe will make formal application to officially proclaim this trust property *reservation land*, which should resolve the jurisdiction issues. The Tribe and the City of Flandreau have joined together to form a City/Tribal Police Department, which will have law enforcement jurisdiction over the subject land. An agreement has been entered into for fire and police protection between the Tribe and the City.

There is an existing dispute regarding state and tribal sales taxation for retail sales at the Royal River Casino but this dispute will not affect these lands since retail sales will not be performed on this land. The Tribe has clearly expressed that these lands will not be used for gaming purposes.

The County currently has this property zoned for agricultural use and that's the way the land will be used until the time comes when the Tribe may have need to use the land for homesites. If the land were to remain in fee status, the County would only allow one house per 40 acres of land. This clearly would cause jurisdictional problems if the land remained in fee status and if the Tribe should ever desire to use the land for housing needs.

(Emphasis in original).

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____